F. #2017R01243

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

     - against -                    Docket No.   17–CR-464 (JS)

MURIEL BESCOND,

          Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - -X

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE INDICTMENT

RICHARD P. DONOGHUE
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Timothy A. Duree
Trial Attorney

Matthew S. Amatruda
Assistant U.S. Attorney
(Of Counsel)

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ......................................................................... 1

FACTUAL BACKGROUND.............................................................................. 1

ARGUMENT .................................................................................................... 3

   I.    DEFENDANT'S MOTION SHOULD NOT BE CONSIDERED
BECAUSE DEFENDANT HAS REFUSED TO MAKE AN
APPEARANCE IN THIS COURT. ................................................................. 3

      a.    Summary ....................................................................................... 3

      b.    The fugitive disentitlement doctrine disallows the filing of motions
by individuals evading United States jurisdiction. ......................................... 3

      c.    The fugitive disentitlement doctrine applies to all indicted
individuals who refuse to face charges against them in the United States. ..................... 5

      d.    Defendant is a fugitive. ..................................................................... 5

      e.    All pertinent policy considerations weigh in favor of disallowing
Defendant's Motion. ..................................................................................... 7

  II.    EVEN IF DEFENDANT'S MOTION IS CONSIDERED ON THE
MERITS, IT MUST FAIL BECAUSE DEFENDANT HAS NO
LEGITIMATE BASIS FOR DISMISSAL. ..................................................... 9

      a.    Summary ....................................................................................... 9

      b.    An indictment may allege either a domestic or an extraterritorial
application of federal law. ............................................................................ 10

      c.    A nexus analysis is undertaken only if a statute is applied
extraterritorially. ...................................................................................... 11

      d.    Defendant's actions implicate a core focus of the CEA, so the
charges against her constitute a domestic violation of the relevant statute. ................... 12

         i.    The central purpose of the CEA is to prevent price manipulation. ................... 13

         ii.    Section 13(a)(2) is intended to apply to the manipulative conduct
in which Defendant engaged. ....................................................................... 13

         iii.    Defendant's manipulative actions fall within the CEA's focus. ....................... 15

III.   THE INDICTMENT WAS TIMELY RETURNED. ................................................. 16

CONCLUSION ................................................................................................................ 17

PRELIMINARY STATEMENT

The United States of America respectfully submits this memorandum of law in opposition to Defendant Muriel Bescond's Motion to Dismiss the Indictment.  ECF No. 6. Because Defendant's Motion is procedurally improper, and because it lacks legal merit, the Motion should be denied.

FACTUAL BACKGROUND

Between May 2010 and at least October 2011, Defendant participated in a scheme to falsely lower the contributions made by her employer to the London Interbank Offered Rate ("LIBOR"), a global benchmark interest rate.  These LIBOR contributions were reduced by Defendant and others in order to make Defendant's employer, Société Générale S.A. ("Société Générale"), appear more creditworthy than it actually was.  As alleged in the indictment, Defendant served as head of Société Générale's Paris treasury desk throughout the course of the conspiracy.  In this role, Defendant supervised a team of subordinate employees who, at her instruction, transmitted inaccurate LIBOR information to the British Bankers' Association, which was tasked with using this data to calculate the final LIBOR number, or "fix," each business day.  This fix was then utilized in the pricing of a wide array of swaps, futures, and other financial instruments.  The dishonest submissions overseen by Defendant frequently altered the day's LIBOR fix, which in turn affected the price of hundreds of millions of dollars of financial products tied to LIBOR.  One type of contract affected by this manipulation was the Eurodollar futures contract, which trades on the Chicago Mercantile Exchange.[1]

---

[1] Eurodollars are United States Dollars on deposit at a bank outside the jurisdiction of the United States.  A Eurodollar futures contract is a derivative contract that allows an

Defendant was indicted in August 2017 for her manipulation of LIBOR. In the indictment, Defendant was charged with causing the transmission of false commodities information, in violation of Title 7, United States Code, Section 13(a)(2). ECF No. 1, at 10-11. This provision of the Commodity Exchange Act ("CEA") makes it illegal "knowingly to deliver or cause to be delivered for transmission through the mails or interstate commerce . . . knowingly inaccurate reports concerning crop or market information . . . that affect or tend to affect the price of any commodity in interstate commerce." 7 U.S.C. § 13(a)(2). Defendant was also charged with conspiracy to defraud the United States, in violation of Title 18, United States Code, Section 371, for conspiring to transmit false commodities information. ECF No. 1, at 9-10.

To date, Defendant, a French national, has refused to face the charges pending in this Court, instead opting to evade American jurisdiction by remaining in her home country of France, from which she cannot be extradited. See Extradition Treaty, U.S.-Fr, Apr. 23, 1997, at 5 (France does not extradite its own citizens, as "there is no obligation upon the Requested State to grant the extradition of a person who is a national of the Requested State").

Despite Defendant's unwillingness to answer the criminal charges, her attorneys now seek to have the charges against her dismissed. Such a motion is procedurally

---

investor to lock in a specific interest rate for the borrowing or lending of Eurodollars at a date in the future. The price of Eurodollar futures contracts is set via reference to the three-month United States Dollar LIBOR. Because these contracts are based on three-month United States Dollar LIBOR, they are essentially an indication of what the market predicts the three-month United States Dollar LIBOR will be on a future date. Thus, Eurodollar futures contracts give investors the opportunity to bet on the prevailing LIBOR on a date in the future.

improper and should be rejected without consideration of the underlying legal arguments.  If, however, the Court chooses to entertain this Motion—which the government avers it should not—the Motion still fails, as Defendant's arguments for dismissal are meritless.

ARGUMENT

I.    DEFENDANT'S MOTION SHOULD NOT BE CONSIDERED BECAUSE DEFENDANT HAS REFUSED TO MAKE AN APPEARANCE IN THIS COURT.

**a.  Summary**

Defendant is a fugitive who has chosen to avoid the reach of this Court by remaining in France.  Until she submits to the jurisdiction of the United States, she has no ability to compel this Court to consider the present Motion—or any type of motion.  Accordingly, Defendant's Motion should be rejected without a review of its merits.

**b.  The fugitive disentitlement doctrine disallows the filing of motions by individuals evading United States jurisdiction.**

"A leading principle that pervades the entire law of criminal procedure is that, after indictment found, nothing shall be done in the absence of the prisoner."  United States v. Canady, 126 F.3d 352, 360 (2d Cir. 1997) (quoting Lewis v. United States, 146 U.S. 370, 372 (1892)).  Equally axiomatic is the idea that federal courts "have certain inherent authority to protect their proceedings and judgments in the course of discharging their traditional responsibilities."  Degen v. United States, 517 U.S. 820, 823 (1996).  From these two core concepts—the necessity of a defendant's presence and the authority of a court to protect the integrity of its judgments—springs the concept of fugitive disentitlement.  This doctrine dictates that the act of being a fugitive "disentitles the defendant to call upon the

3

resources of the Court for determination of his claims." Molinaro v. New Jersey, 396 U.S. 365, 366 (1970).

Fugitive disentitlement is an equitable doctrine that is informed by four independent justifications: "(1) assuring the enforceability of a decision against a fugitive; (2) imposing a penalty for flouting the judicial process; (3) discouraging flights from justice to promote efficient operation of the courts; and (4) avoiding prejudice to the other side engendered by a defendant's flight." Hanson v. Phillips, 442 F.3d 789, 795 (2d Cir. 2006) (internal quotation omitted).

This doctrine "is grounded on the impropriety of permitting a fugitive to pursue a claim in federal court where he might accrue a benefit, while at the same time avoiding an action of the same court that might sanction him." United States v. Eng, 951 F.2d 461, 465 (2d Cir. 1991). By barring fugitives from seeking relief from the very courts that they avoid, the doctrine "'encourages voluntary surrenders,' and 'promotes the efficient, dignified operation' of the courts." Degen, 517 U.S. at 823 (quoting Estelle v. Dorrough, 420 U.S. 534, 537 (1975)). Put simply, the fugitive disentitlement doctrine reflects the "unwillingness of courts to waste time and resources exercising jurisdiction over litigants who will only comply with favorable rulings of the court." United States v. Oliveri, 190 F. Supp. 2d 933, 935 (S.D. Tex. 2001). The doctrine, which enables the efficient and fair management of litigation, is often applied to bar the filing of pretrial motions by fugitives. See, e.g., United States v. Kashamu, 656 F. Supp. 2d 863, 866–67 (N.D. Ill. 2009) (noting that "the fugitive disentitlement doctrine can apply to pretrial motions in criminal cases" and collecting selected cases).

4

**c. The fugitive disentitlement doctrine applies to all indicted individuals who refuse to face charges against them in the United States.**

As its name implies, the fugitive disentitlement doctrine prohibits the filing of motions by fugitives.  Thus, before refusing consideration of a motion filed by a person not physically present, a court must first "consider the threshold question of whether the defendant is a 'fugitive.'"  United States v. Hayes, 118 F. Supp. 3d 620, 624 (S.D.N.Y. 2015).

"Fleeing from justice is not always a physical act; it may be a state of mind."  Eng, 951 F.2d at 464.  Accordingly, "a defendant with notice of criminal charges who actively resists returning from abroad to face those charges is a fugitive from justice."  Id.; see also United States v. Blanco, 861 F.2d 773, 779 (2d Cir. 1988) ("A person can be said to be a fugitive when, while abroad, they learn that they are under indictment and make no effort to return to the United States to face charges.").

**d. Defendant is a fugitive.**

In the present case, Defendant is a fugitive, choosing to remain outside the jurisdictional reach of this Court.  She has been fully apprised of the existence of the indictment against her, yet has refused to come to the jurisdiction to answer the charges against her.  Instead, Defendant has chosen to remain in her home country of France, from which extradition to the United States is not possible.

Even though she refuses to submit to this Court's jurisdiction, Defendant suggests that she should not be considered a fugitive because "there is no allegation that [she] was present in the United States . . . when she engaged in the alleged criminal conduct."  ECF No. 6-1, at 8.  In Defendant's view, she cannot be classified as a fugitive

5

because "[t]he Second Circuit has defined 'fugitive' as 'a person who, having committed a crime, flees from the jurisdiction of the court where a crime was committed or departs from his usual place of abode and conceals himself within the district.'"  ECF No. 6-1, at 7 (quoting Empire Blue Cross & Blue Shield v. Finkelstein, 111 F.3d 278, 281 (2d Cir. 1997)). This argument lacks merit.

      Here, Defendant focuses on "a meaningless distinction.  The primary purpose of the fugitive disentitlement doctrine—promoting mutuality of litigation—is served both when a defendant flees the United States and when he chooses to remain outside the United States."  United States v. Miller, 166 F. Supp. 3d 346, 348 (W.D.N.Y. 2016).  Thus, "[i]t is entirely irrelevant" whether Defendant left the United States after being charged or simply declined to come to the United States upon learning of the criminal charges.  *Id.*  Either way, she is a fugitive.

      Further, Defendant's attempted reliance on a definition referenced in Finklestein is misleading and unavailing.  In the quoted Finklestein decision, the Second Circuit did not adopt the definition suggested by Defendant.  Rather, the court noted in dicta that Black's Law Dictionary so defined the term 'fugitive.'  *Finkelstein*, 111 F.3d at 281. Thereafter, the court concluded that the defendants in that case—civil defendants who took significant steps to avoid process and faced a sizeable judgment—were in fact fugitives.  *Id.* at 282.[2]

---

[2] Additionally, the government has found no cases subsequent to Finklestein in which the Second Circuit adopted the definition of 'fugitive' advanced by Defendant.  Indeed, Black's Law Dictionary has since changed its definition of fugitive, which has been broadened to encompass "[a] criminal suspect or a witness in a criminal case who flees, evades, or escapes arrest, prosecution, imprisonment, service of process, or the giving of testimony."  BLACK'S LAW DICTIONARY, Fugitive (10th ed. 2014).  Under the current

As explained in a factually analogous case, "[t]he Court cannot be bound by the semantics that limit fugitive status to fleeing or failing to return when dealing with an international criminal defendant who allegedly violated United States law from abroad." Hayes, 118 F.Supp.3d at 626.  Rather, "the definition of a 'fugitive' should take account of the realities of modern criminal prosecutions, coping with the strains of globalization." Id. Accordingly, a defendant who would be arrested upon entering the United States but evades capture by staying in her home country is properly considered to be a fugitive. See id. (Swiss defendant who "allegedly violated United States law," is subject to a United States arrest warrant, "would be arrested if he entered the United States," and "avoided arrest by remaining in Switzerland," is a fugitive.)  Accordingly, Defendant is a fugitive.

### e. All pertinent policy considerations weigh in favor of disallowing Defendant's Motion.

Given Defendant's status as a fugitive, the Court should decline to entertain her Motion.  As mentioned above, four policy considerations undergird the fugitive disentitlement doctrine: "(1) assuring the enforceability of a decision against a fugitive; (2) imposing a penalty for flouting the judicial process; (3) discouraging flights from justice to promote efficient operation of the courts; and (4) avoiding prejudice to the other side engendered by a defendant's flight." Hanson v. Phillips, 442 F.3d 789, 795 (2d Cir. 2006) (internal quotation omitted).  All four weigh against Defendant.

First, although Defendant appears willing to accept a favorable ruling on her Motion—that is, a dismissal—there is absolutely no indication that she would submit to the

---

definition, Defendant, who is actively evading both arrest and prosecution, plainly qualifies as a fugitive.

Court's jurisdiction if her Motion were denied.  As such, the Court's decision would be

wholly unenforceable.  The Court should not countenance such a result.  Defendant "is not

entitled to receive any potentially favorable rulings from this Court if [she] is unwilling to

stand for and face the consequences of any potentially unfavorable rulings."  United States v.

Buck, No. 13 CR 282 (VM), 2015 WL 195872, at *3 (S.D.N.Y. Jan. 9, 2015).  Defense

counsel has repeatedly suggested to the government that Defendant does not intend to travel

to the United States to have the case against her adjudicated.  Thus, Defendant "is willing to

enjoy the benefits of a legal victory, but is not at all prepared to accept the consequences of

an adverse holding."  United States v. Stanzione, 391 F. Supp. 1201, 1202 (S.D.N.Y. 1975).

In order to "insure some form of 'mutuality,'" courts are generally "unwilling to allow a

defendant to gain the benefit of a favorable result when he is unwilling to risk the burden of

an adverse decision."  United States v. Shapiro, 391 F. Supp. 689, 693 (S.D.N.Y. 1975).

Defendant should not be permitted to engage in this type of "one-sided litigation."  Miller,

166 F. Supp. 3d at 348.  Accordingly, her Motion should be denied.

       Second, Defendant's effort to litigate from afar flouts judicial process.  She is

"attempt[ing] to invoke from a safe distance only so much of a United States court's

jurisdiction" as might benefit her "while carefully shielding [herself] from the possibility of a

penal sanction."  Collazos v. United States, 368 F.3d 190, 200 (2d Cir. 2004).  Her efforts are

intended to undermine established judicial process.  If Defendant desires resolution of her

case, she is welcome to take the course of action available to all defendants: appear in the

Eastern District of New York and litigate this matter.  "Until [Defendant] is willing to submit

[her] case for complete adjudication, however, [she] should not be permitted to utilize the

resources of the court to determine isolated issues." <u>United States v. Chung Cheng Yeh</u>, No. CR 10-00231 (WHA), 2013 WL 2146572, at *3 (N.D. Cal. May 15, 2013).

Third, if this Court ruled on Defendant's Motion without requiring her to be physically present in the United States, it would incentivize flight in future cases. This would be a deeply troubling outcome. Such a ruling "would be tantamount to signaling to future defendants that their best strategy would be to flee prosecution and deliver [] demands from a non-extradition country." <u>Buck</u>, 2015 WL 195872, at *3; <u>see also</u> <u>Oliveri</u>, 190 F. Supp. 2d at 936 ("the court notes that reaching the merits of a fugitive's pretrial motion may encourage others in the same position to take flight from justice"). Defendant "should not reap the benefit of purposefully evasive behavior, and issuing a ruling in these circumstances could encourage such behavior." <u>United States v. Vaulin</u>, No. 16 CR 438-1, 2017 WL 3334861, at *5 (N.D. Ill. Aug. 4, 2017). As such, this factor weighs against Defendant.

Finally, issuing a ruling in this case would exacerbate the prejudice caused to the government by Defendant's flight. The government cannot proceed with its case until Defendant appears in the Eastern District of New York. Her fugitive status is thus highly prejudicial to the government.

In sum, all four policy considerations militate against entertaining Defendant's Motion. Thus, the Court should deny Defendant's Motion without considering its merits.

II.    <u>EVEN IF DEFENDANT'S MOTION IS CONSIDERED ON THE MERITS, IT MUST FAIL BECAUSE DEFENDANT HAS NO LEGITIMATE BASIS FOR DISMISSAL.</u>

   **a. Summary**

If the Court chooses to entertain the substance of Defendant's Motion—which the government avers it should not—Defendant's arguments must still fail. Defendant

9

misapplies the pertinent law, assuming that a nexus test is necessary to analyze the adequacy

of the indictment, when in fact such a test is entirely irrelevant here.  Despite Defendant's

contentions otherwise, the indictment alleges an appropriate domestic violation of the

relevant statute and is thus entirely sufficient.

### b. An indictment may allege either a domestic or an extraterritorial application of federal law.

An indictment may properly charge that a defendant engaged in either a

domestic violation or extraterritorial violation of federal law.  To assess whether an

indictment implicating foreign conduct is properly charged, courts apply a "two-step

framework." RJR Nabisco, Inc. v. European Cmty., 136 S. Ct. 2090, 2101 (2016).  First, a

court asks "whether the statute gives a clear, affirmative indication that it applies

extraterritorially." Id.  If the statute lacks extraterritorial scope, then the court must

"determine whether the case involves a domestic application of the statute, and we do this by

looking to the statute's 'focus.'" Id.  A court should be cognizant that "[i]f the conduct

relevant to the statute's focus occurred in the United States, then the case involves a

permissible domestic application even if other conduct occurred abroad." Id.

Where appropriate, a court may begin its inquiry by analyzing the 'focus'

prong. Id. at 2101 n.5.  Such an approach is warranted here.  The indictment charges a

domestic application of Section 13(a)(2), and this fact, once established, obviates the need

for an extraterritoriality assessment.

To decide whether an indictment charges a domestic violation of a criminal

statute, a court must determine "the 'focus' of congressional concern." Morrison, 561 U.S.

at 266 (quoting Equal Opportunity Employment Comm'n v. Arabian American Oil Co., 499

10

U.S. 244, 255 (1991)).  This requires an assessment of the "domestic conduct the statute regulates."  In re LIBOR-Based Fin. Instruments Antitrust Litig., 935 F. Supp. 2d 666, 695 (S.D.N.Y. 2013) (vacated on other grounds by Gelboim v. Bank of Am. Corp., 823 F.3d 759 (2d Cir. 2016)).  Such an analysis should consider "the objects of the statute's solicitude," including "those transactions that the statute seeks to 'regulate'" and the parties "that the statute seeks to protect."  Morrison, 561 U.S. at 266-67.

### c. A nexus analysis is undertaken only if a statute is applied extraterritorially.

Nexus inquiries are only necessary if a statute is applied extraterritorially.  See United States v. Al Kassar, 660 F.3d 108, 118 (2d Cir. 2011) ("'In order to apply extraterritorially a federal criminal statute to a defendant consistently with due process, there must be a sufficient nexus between the defendant and the United States, so that such application would not be arbitrary or fundamentally unfair.'") (quoting United States v. Davis, 905 F.2d 245, 248–49 (9th Cir. 1990)).  Accordingly, this nexus analysis should be employed only if all of the pertinent criminal conduct occurred outside "the territorial jurisdiction of the United States."  Morrison v. Nat'l Australia Bank Ltd., 561 U.S. 247, 255 (2010) (quoting Arabian American Oil Co., 499 U.S. at 248).[3]

---

[3] The government has found no case law specifically addressing whether the false reporting subsection of 7 U.S.C. § 13(a)(2)—the subsection charged here—can be applied extraterritorially.  However, the government recognizes that the Second Circuit has held that the CEA "as a whole . . . is silent as to extraterritorial reach."  Loginovskaya v. Batratchenko, 764 F.3d 266, 271 (2d Cir. 2014).  Because the present case involves a domestic application of the statute, the extraterritorial scope of this statute is not at issue. Thus, the Court here need not decide whether the charged subsection of Section 13(a)(2) may be applied extraterritorially.

"[C]ourts faced with a territorial offense . . . do not need to conduct a 'nexus' inquiry." Hayes, 118 F. Supp. 3d at 628.  Thus, if a portion of the conduct relevant to the criminal charge took place in the United States, then no nexus analysis is warranted.  In such a case, a court "need not address whether these statutes have extraterritorial application." United States v. Kazzaz, 592 F. App'x 553, 554 (9th Cir. 2014).  Indeed, if there is "a sufficient domestic nexus between the allegations" and the charged violations, then the court can "avoid the question of extraterritorial application altogether."  United States v. Mostafa, 965 F. Supp. 2d 451, 469 (S.D.N.Y. 2013).

### d. Defendant's actions implicate a core focus of the CEA, so the charges against her constitute a domestic violation of the relevant statute.

Here, Defendant's conduct constitutes a domestic violation of the charging statute, so no nexus inquiry is needed.  Defendant argues at length that the indictment should be dismissed because it "fails to establish a sufficient nexus between Mme. Bescond and the United States."  ECF 6-1, at 13.  This misguided argument fails to acknowledge that the nexus test is only utilized if a statute is applied extraterritorially.  Defendant ignores that the charges against her involve a domestic application of the pertinent statute, not an extraterritorial one.  The indictment against Defendant focuses on Defendant's effort to cause pertinent market information to be transmitted into the Eastern District of New York, which is conduct that comes within the focus of the CEA.  Because the indictment does not allege an extraterritorial application of the criminal statute in question, there is no basis to conduct a nexus inquiry.  Rather, as long as the Court determines that Defendant's conduct falls within the focus of the relevant statute, then the indictment is sufficient.

12

       *i.   The central purpose of the CEA is to prevent price manipulation.*

      The CEA's expansive mandate to protect against false market information is well established.  Among the statutory purposes of the CEA are "to deter and prevent price manipulation or any other disruptions to market integrity" and "to ensure the financial integrity" of futures transactions.  7 U.S.C. § 5(b).  As explained by the Seventh Circuit, "[o]ne of Congress's fundamental purposes in enacting the CEA was to ensure fair practice and honest dealings on commodity exchanges, for the protection of the market itself as well as those who could be injured by unreasonable fluctuations in commodity prices."  Tamari v. Bache & Co. (Lebanon) S.A.L., 730 F.2d 1103, 1106 (7th Cir. 1984); see also Leist v. Simplot, 638 F.2d 283, 304-05 (2d Cir. 1980) ("[t]he fundamental purpose of the measure is to insure fair practice and honest dealing on the commodity exchanges") (internal quotations omitted); U.S. Commodity Futures Trading Comm'n v. Parnon Energy Inc., 875 F. Supp. 2d 233, 243 (S.D.N.Y. 2012) (noting that "the CEA's primary purpose" is "preventing and deterring price manipulations"), U.S. Commodity Futures Trading Comm'n v. PMC Strategy, LLC, 903 F. Supp. 2d 368, 376 (W.D.N.C. 2012) ("the Court is mindful that a crucial purpose of the Act is 'protecting the innocent individual investor—who may know little about the intricacies and complexities of the commodities market—from being misled or deceived'") (quoting U.S. Commodity Futures Trading Comm'n v. R.J. Fitzgerald & Co., Inc., 310 F.3d 1321, 1329 (11th Cir. 2002)).

       *ii.   Section 13(a)(2) is intended to apply to the manipulative conduct in which Defendant engaged.*

      The language of Section 13(a)(2) indicates that it advances the CEA's broad purposes by criminalizing the transmission of all false commodities-related reports sent into

the United States, irrespective of whether those transmissions originated in a foreign location.  As mentioned above, the statute prohibits the transmission "through interstate commerce" of false market reports "that affect or tend to affect the price of any commodity in interstate commerce." 7 U.S.C. § 13(a)(2).  "Interstate commerce," in turn, is defined by the CEA as commerce "between any State, territory, or possession, or the District of Columbia, *and any place outside thereof*."  7 U.S.C. § 1a(30)(A) (emphasis added).

Courts faced with identically-worded statutes have concluded that transactions originating in a foreign location and ending in the United States are transactions in interstate commerce.  As one example, a court in the Southern District of New York found that the shipment of switchblade knives from London to New York was prohibited under a statute which disallows the introduction of such knives "into interstate commerce."  Precise Imports Corp. v. Kelly, 218 F. Supp. 494, 496 (S.D.N.Y. 1963) (citing 15 U.S.C. § 1241).  There, the relevant provision defined interstate commerce as "commerce between any State . . . and any place outside thereof."  15 U.S.C. § 1242.  The court "conclude[d] that the statute covers foreign imports" and noted that "the normal meaning of the words . . . includes shipments from abroad."  Kelly, 218 F. Supp. at 496.

A similar result was reached in a case involving the transportation of fish from Canada to Detroit.  230 Boxes, More or Less, of Fish v. United States, 168 F.2d 361 (6th Cir. 1948).  In that instance, the pertinent statute defined interstate commerce as "between any State or Territory and any place outside thereof."  Id. at 363 (quoting 21 U.S.C. § 321(b)).  The Sixth Circuit decided that under this definition, transportation from Canada to the United States qualified as interstate commerce.  Id.  In a third case, a Fair Labor Standards Act provision defining commerce as "'transportation . . .  among the several States

14

or between any State and any place outside thereof" was found to apply to an individual who was engaged in transportation from the United States to foreign destinations. Caserta v. Home Lines Agency, Inc., 273 F.2d 943, 945-46 (2d Cir. 1959).

The interstate commerce provision in the CEA is worded virtually identically to those described above and, like these other statutes, should apply to communications between a foreign location and the United States. Indeed, this broad definition of "interstate commerce" provides further indication that the drafters of the CEA intended the Act to achieve its fundamental purpose, which "is to insure fair practice and honest dealing on the commodity exchanges and to provide a measure of control over . . . speculative activity." United Egg Producers v. Bauer Int'l Corp., 311 F. Supp. 1375, 1384 (S.D.N.Y. 1970).

### iii. Defendant's manipulative actions fall within the CEA's focus.

Defendant caused acts to occur in the United States that implicated the core focus of the CEA. She emphasizes that she took no action in furtherance of the criminal conduct while inside the United States. But her argument misses the point. Defendant caused false market information to be transmitted into the United States, and this information affected the price of futures contracts, including Eurodollar futures, which are priced based on LIBOR and which trade on the Chicago Mercantile Exchange. This act comes squarely within the scope of the CEA's solicitude. "LIBOR was directly incorporated into the *price* of Eurodollar futures contracts, and by allegedly manipulating LIBOR, defendant[] manipulated the price of those contracts." In re LIBOR, 935 F. Supp. 2d 666 at 697 (emphasis in original). Defendant's actions "clearly involve manipulation of the price of

Eurodollar futures contracts, and manipulating the price of futures contracts traded on domestic exchanges is precisely the conduct that the CEA was designed to regulate." Id.

The acts directed by Defendant caused price manipulation in the United States, blemished the integrity of domestic market transactions, undermined fair practice, and harmed the American commodities market itself.  This is precisely what the CEA seeks to regulate.  Thus, the charges against Defendant constitute a domestic application of the relevant statute.[4]  Because Defendant is charged with a domestic criminal violation, the indictment is entirely adequate and should stand.

III.   THE INDICTMENT WAS TIMELY RETURNED.

The indictment against Defendant was obtained in a timely manner.  A tolling order was properly secured by the Government, and the indictment was returned within the period of time allowed by the tolling order.  Thus, the indictment is not affected by statute of limitations issues.[5]

---

[4] Although Defendant does not directly raise the issue, the government notes that venue is appropriate in the Eastern District of New York because it was foreseeable to Defendant that an act in furtherance of the crime would occur in this District.  Société Générale's manipulated LIBOR information was transmitted each day to data controlled by Thomson Reuters in the Eastern District of New York.  Defendant could easily foresee that data pertinent to an interest rate of global importance would be transmitted worldwide, including to the Eastern District of New York, which is part of one of the world's financial capitals.  Venue may lie in a district if "the defendant intentionally or knowingly causes an act in furtherance of the charged offense to occur in the district of venue" or if "it is foreseeable that such an act would occur in the district of venue."  *United States v. Svoboda*, 347 F.3d 471, 483 (2d Cir. 2003); *see also United States v. Royer*, 549 F.3d 886, 894 (2d Cir. 2008) (venue appropriate if it is foreseeable that an act in furtherance of a crime "would occur in the district of venue [and it does].") (brackets in original).

[5] As discussed above, Defendant's Motion is procedurally improper, and thus, Defendant has no basis to compel the government to recite a detailed factual defense of the timeliness of the Indictment.  If the Court chooses to address the merits of Defendant's

<u>CONCLUSION</u>

As discussed above, Defendant is a fugitive and is not entitled to have the
Court consider her Motion at the current time.  Even if the Court chooses to review the
merits of her Motion, it must fail.  The indictment alleges a domestic application of the
pertinent criminal statute; thus, no nexus analysis is warranted.  Further, the government
secured a tolling order and timely obtained the indictment, so no statute of limitations issues
exist here.  Accordingly, Defendant's Motion should be denied.


Dated:      Central Islip, New York
             June 29, 2018

                                      Respectfully submitted,

                                      RICHARD P. DONOGHUE
                                      UNITED STATES ATTORNEY
                                      Eastern District of New York
                                      271 Cadman Plaza East
                                      Brooklyn, New York 11201


                              By:     /s/ Timothy A. Duree
                                      Timothy A. Duree
                                      Trial Attorney
                                      United States Department of Justice
                                      Criminal Division, Fraud Section
                                      (202)616-2660

                                      Matthew S. Amatruda
                                      Assistant United States Attorney
                                      (718)254-701

---

statute of limitations argument, the government would request the opportunity to file a
supplemental brief fully explaining the pertinent facts and law relating to timeliness.

17

<u>CERTIFICATE OF SERVICE</u>

I, Timothy A. Duree, hereby certify that on this 29th day of June, 2018, I caused a copy of this Memorandum of Law in Opposition to Defendant's Motion to Dismiss the Indictment to be served on Laurence Shtasel and Laurent Cohen-Tanugi, attorneys for Defendant Muriel Bescond, by filing this document via the CM/ECF electronic filing system.


/s/ Timothy A. Duree
Timothy A. Duree