IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| | : | |
| UNITED STATES OF AMERICA | : | Criminal No. 2:17-cr-00464-JS |
| | : | |
| v. | : | |
| | : | |
| DANIELLE SINDZINGRE and | : | |
| MURIEL BESCOND, | : | |
| | : | |
| Defendants | : | |
| | : | |

## **MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR RECONSIDERATION OF DEFENDANT MURIEL BESCOND'S MOTIONS TO DISMISS THE INDICTMENT**

## **TABLE OF CONTENTS**

TABLE OF CONTENTS..................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................1

FACTUAL BACKGROUND..............................................................................................3

PROCEDURAL HISTORY.................................................................................................4

ARGUMENT ......................................................................................................................7

    I.      The Court's Alternative Extraterritoriality and Due Process Rulings Merit
           Reconsideration After *Prime* ...................................................................................7

           A.     *Prime* Establishes the Proper Standard for Analyzing the
                   Extraterritorial Application of the CEA.........................................................7

           B.     *Prime* Establishes That the Indictment Impermissibly Charges
                   Extraterritorial Claims Under the CEA..........................................................8

           C.     District Courts Have Dismissed Similar CEA Claims as
                   Impermissibly Extraterritorial After *Prime* ...............................................16

           D.     *Prime* Also Supports Reconsideration of the Court's Due Process
                   Decision ........................................................................................................18

    II.     Absent Dismissal, the Government Should be Ordered to Provide Discovery
           and Additional Briefing on Mme. Bescond's Motions to Dismiss Based on
           the Statute of Limitations and Selective Prosecution ...........................................20

CONCLUSION..................................................................................................................22

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Atl. Trading USA, LLC v. BP P.L.C.*,
  141 S. Ct. 113, 207 L. Ed. 2d 1053 (2020) ...........................................................................10

*Jacob v. Duane Reade, Inc.*,
  293 F.R.D. 578 (S.D.N.Y. 2013) ...........................................................................................7

*Laydon v. Mizuho Bank, Ltd.*,
  No. 12 Civ. 3419 (GBD), 2020 WL 5077186 (S.D.N.Y. Aug. 27, 2020) ................7, 8, 17, 18

*Loginovskaya v. Batratchenko*,
  764 F.3d 266 (2d Cir. 2014)...............................................................................................8, 9

*Morrison v. Nat'l Austl. Bank Ltd.*,
  561 U.S. 247 (2010).................................................................................................. *passim*

*Parkcentral Global Hub Ltd. v. Porsche Automobile Holdings SE*,
  763 F.3d 198 (2d Cir. 2014).........................................................................................14, 15

*In re: Platinum and Palladium Antitrust Litigation*,
  449 F.Supp.3d 290 (S.D.N.Y. Mar. 29, 2020)...........................................................8, 16, 17

*In re: Platinum and Palladium Antitrust Litigation*,
  No. 1:14-CV-9391-GHW, 2017 WL 1169626 (S.D.N.Y. Mar. 28, 2017) .............................16

*Prime Int'l Trading, Ltd. v. BP P.L.C. et al.*,
  937 F.3d 94 (2d Cir. 2019).......................................................................................... *passim*

*RJR Nabisco, Inc. v. European Cmty.*,
  579 U.S. 325 (2016).....................................................................................................8, 10, 11

*Shrader v. CSX Transp., Inc.*,
  70 F.3d 255 (2d Cir. 1995).....................................................................................................7

*United States v. Al Kassar*,
  660 F.3d 108 (2d Cir. 2011)............................................................................................18, 19

*United States v. Bescond*,
  24 F.4th 759 (2d Cir. 2021) ........................................................................................ *passim*

*United States v. Connolly*,
  24 F. 4th 821 (2d Cir. 2022) ..................................................................................................3

*United States v. Mostafa¸*
    965 F. Supp. 2d 451 (S.D.N.Y. 2013) ................................................................. 18

*United States v. Reichberg*,
    No. 16-cr-468 (GHW), 2018 WL 6599465 (S.D.N.Y. Dec. 14, 2018) ................ 7

*United States v. Sessa*,
    No. 92-CR-351 (ARR), 2022 WL 970778 (E.D.N.Y. Mar. 31, 2022) .................. 7

*United States v. Sindzingre*,
    No. 17-CR-0464(JS), 2019 WL 2290494 (E.D.N.Y. May 29, 2019) ........................... *passim*

*United States v. Vilar*,
    729 F.3d 62 (2d Cir. 2013) .................................................................................. 9

*United States v. Zedner*,
    No. 06-cr-717 (ADS), 2006 WL 6201757 (E.D.N.Y. Nov. 17, 2006) ................ 7

*Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*,
    956 F.2d 1245 (2d Cir. 1992) .............................................................................. 7

**Statutes**

CEA § 9(a)(2), codified at 7 U.S.C. § 13(a)(2) ....................................................... *passim*

18 U.S.C. § 2 ........................................................................................................... 4

18 U.S.C. § 371 ....................................................................................................... 4

18 U.S.C. § 3292 ............................................................................................... 20, 21

18 U.S.C. § 3551, *et seq.* ........................................................................................ 4

Securities Exchange Act of 1934, Section 10(b) .................................................. 14

**Other Authorities**

Local Rule 6.3 ......................................................................................................... 7

On February 3, 2022, the Second Circuit ruled that Defendant Muriel Bescond is not a fugitive and remanded this case for "further proceedings to consider or reconsider the merits of her motions to dismiss." *United States v. Bescond*, 24 F.4th 759, 775 (2d Cir. 2021).  Mme. Bescond respectfully submits this memorandum of law in support of her motion for reconsideration.  In particular, Mme. Bescond seeks reconsideration of that portion of the Court's Memorandum & Order of May 29, 2019 (the "May 2019 Decision") denying her motions to dismiss the Indictment because it impermissibly charges her with extraterritorial violations of the Commodity Exchange Act ("CEA"), 7 U.S.C. § 1, *et seq.*, and is inconsistent with due process.  Bescond's motion should be granted based on *Prime Int'l Trading, Ltd. v. BP P.L.C. et al.*, 937 F.3d 94 (2d Cir. 2019) – decided by the Second Circuit three months after the Court's May 2019 Decision – which rejected the analysis urged by the government and adopted by the Court in this case.  *Prime* ruled that the CEA cannot be applied where, as here, the allegedly wrongful conduct took place outside the United States.

While it is difficult to imagine the Indictment's survival in light of *Prime*'s binding precedential authority, should the Court not order dismissal, Mme. Bescond requests that the Court issue an order requiring the government to: (i) both brief and provide additional information in response to her motion to dismiss based on the statute of limitations; and (ii) provide discovery relevant to her motion to dismiss based on selective prosecution.  *See United States v. Sindzingre*, No. 17-CR-0464(JS), 2019 WL 2290494, at *9 (E.D.N.Y. May 29, 2019) (stating that "additional briefing and information" would be "require[d]" to decide these motions).

**PRELIMINARY STATEMENT**

In its "Alternative Ruling" in the May 2019 Decision, the Court denied Mme. Bescond's motions to dismiss the Indictment as an impermissible extraterritorial application of the CEA and as inconsistent with due process.  *Id.*  The Court's decision followed from its determinations that:

(i) the focus of Section 9(a)(2) of the CEA is "any commodity in interstate commerce"; and (ii) the conduct relevant to determining whether the CEA is being applied domestically rather than extraterritorially "is the manipulation of the price of any commodity bought or sold in the United States, regardless of the location from which a defendant causes a false report to be transmitted in or into the United States." *Sindzingre*, 2019 WL 2290494, at *12-*13 (emphasis added). Subsequent to this Court's decision, on August 29, 2019, the Second Circuit ruled in *Prime* that the proper focus of CEA Section 9(a)(2) is not that identified in this Court's May 2019 Decision, but rather "preventing manipulation of the price of any commodity." *Prime* additionally ruled that the relevant factor in determining whether the CEA is being applied domestically or extraterritorially is the location of the alleged manipulative conduct. Thus, while this Court originally found that the purchase or sale of a commodity in the United States is sufficient domestic conduct to overcome the presumption against extraterritoriality, *Prime* ruled to the contrary by establishing that a CEA Section 9(a)(2) claim can only survive if the alleged manipulative conduct occurred domestically – i.e., in the United States. *Id.* at 108.

Here, after reversing the Court's decision based on the Fugitive Disentitlement Doctrine, the Second Circuit then remanded this case to permit Mme. Bescond to seek reconsideration of her motions to dismiss, including in light of *Prime*. *Bescond*, 24 F.4th at 772. Following *Prime*, it is clear that the CEA claims alleged in the Indictment are impermissibly extraterritorial because all of the alleged manipulative conduct occurred outside of the United States. Therefore, and as discussed in detail below, the Indictment must be dismissed in its entirety. Should the Court somehow conclude that *Prime* does not compel dismissal, the Court should order the government to supply additional briefing and information consistent with the May 2019 Decision to permit the

Court to rule upon Mme. Bescond's motions to dismiss based on the statute of limitations and selective prosecution. *See Sindzingre*, 2019 WL 2290494, at *9.

## **FACTUAL BACKGROUND**

This case arises out of the employment of Mme. Bescond, a French citizen living in France, at a French bank, Société Générale, as head of its Paris treasury desk.  Indictment ¶¶ 1, 3.  In this role, among other duties, Mme. Bescond oversaw the individuals who prepared Société Générale's U.S. dollar LIBOR[1] submissions ("submitters") under the supervision of co-defendant Mme. Sindzingre.  Indictment ¶ 15.  The Indictment alleges that Mme. Bescond, in supervising Société Générale's submitters in Paris, and along with many others, caused the bank to make false and misleading reports to the BBA of the bank's borrowing rates on various dates in 2010 and 2011, specifically by lowering Société Générale's LIBOR submissions.  Indictment ¶ 14.[2]  The Indictment alleges that the purported scheme was directed by members of Société Générale's most senior executives in Paris who comprised its General Directorate.  *See* Indictment ¶ 19; *see also* Dkt. No. 12-2 at A-44—A-45 & Dkt. No. 12-3 at 17.  <u>There is no allegation that any fraudulent conduct by Mme. Bescond or her alleged co-conspirators took place in the United States</u>.

---

[1] LIBOR is a benchmark interest rate used to settle trades in various financial instruments, which was overseen at the relevant time by the British Banker's Association (the "BBA"), a non-governmental trade association based in London. Indictment ¶ 9.

[2] Defendant notes the recent decision in *United States v. Connolly*, 24 F. 4th 821 (2d Cir. 2022), a LIBOR manipulation case brought under bank and wire fraud statutes, wherein the Second Circuit reversed defendants' convictions by rejecting the notion that there is "one true [LIBOR] rate" on any given day that a panel bank was required to submit to the BBA. *Id.* at 837.  The Court held that the government had failed to prove that the bank's "trader-induced" LIBOR submissions – which were designed purely to benefit specific trading positions and not to track actual borrowing rates – did not reflect rates at which the bank *could have* borrowed on that date, even if it had not.  *Connolly* calls into serious question the government's ability to successfully prosecute *any* LIBOR manipulation case and, depending on this Court's rulings, Mme. Bescond reserves the right to invoke *Connolly* as a further basis for dismissal of the Indictment.

The alleged "purpose of the scheme was to avoid anticipated reputational harm to Société Générale" by making it "appear to the public that Société Générale was able to borrow money at lower interest rates than the rates that were actually available to the Bank." Indictment ¶ 14.  This was because senior executives at the bank allegedly believed that submitting honest estimates of Société Générale's borrowing rates would make the bank appear financially unsound.  *Id.*  For this reason, this case is unlike any other LIBOR manipulation prosecution in the United States, which generally involve traders conspiring with LIBOR submitters to move the LIBOR rate in directions favorable to trading positions.  The Indictment is the government's first and only attempt at prosecuting a pure "reputation-" or "stigma-based" LIBOR claim.

The Indictment charges Mme. Bescond with conspiracy to transmit false, misleading and knowingly inaccurate commodities reports in violation of CEA § 9(a)(2), codified at 7 U.S.C. § 13(a)(2) (Count 1), and transmission of false, misleading and knowingly inaccurate commodities reports in violation of 7 U.S.C. § 13(a)(2) and 18 U.S.C. §§ 371, 2 and 3551, *et seq.* (Counts 2-5).  *See* Indictment ¶¶ 32-36.  None of the members of Société Générale's General Directorate was charged with any offenses, despite the Indictment's allegations that they orchestrated the charged scheme.  *See* Indictment ¶¶ 18, 23-25, 29-30.

## PROCEDURAL HISTORY

The Indictment was filed on August 24, 2017.  Dkt. No. 1.  Mme. Bescond moved to dismiss the Indictment on four grounds: (1) the Indictment involved an impermissible extraterritorial application of the CEA, Dkt. No. 18; (2) the prosecution violates the Fifth Amendment's Due Process Clause because Mme. Bescond lacks a sufficient connection with the United States to permit her prosecution, Dkt. No. 6; (3) the Indictment was returned after the expiration of the applicable five-year statute of limitations, *id.*; and (4) the prosecution  constitutes

4

an impermissible selective prosecution based upon gender, Dkt. No. 12. The government opposed dismissal, primarily arguing that Mme. Bescond is a "fugitive" and, therefore, not entitled to consideration of her motions because she has not voluntarily left her home in France – which does not extradite its citizens – to appear in this proceeding. *See* Dkt. Nos. 10 & 15.

On May 29, 2019, this Court issued a Memorandum & Order finding Mme. Bescond was not entitled to a ruling on the merits of her motions due to the Fugitive Disentitlement Doctrine. *Sindzingre*, 1999 WL 2290494, \*9. However, conceding that the Second Circuit's existing holdings on fugitive disentitlement did not address a defendant like Mme. Bescond, this Court included an "Alternative Ruling" on Mme. Bescond's extraterritoriality and due process arguments. *Id.* at \*10. With respect to extraterritoriality, the May 2019 Decision noted that neither party contended that the CEA provided for extraterritorial application, but found that the Indictment charges domestic – not extraterritorial – violations of CEA Section 9(a)(2). *Id.* at \*11-13. The decision reasoned that the "focus" of congressional concern of this provision of the CEA is "any commodity in interstate commerce," regardless of the location of the alleged manipulative conduct. *Id.* at \*12–\*13. Building upon its extraterritoriality ruling, the Court further determined that the government did not need to allege any nexus between Mme. Bescond and the United States to comply with due process requirements because the Indictment alleges "domestic" offenses, and the prosecution is not "fundamentally unfair." *Id.* at \*13–\*14.

The Court did not issue alternative rulings with respect to Mme. Bescond's statute of limitations and selective prosecution arguments, stating that resolution of these motions "would require additional briefing and information." *Sindzingre*, 2019 WL 2290494, at \*9. In particular, the Court indicated that the government would need to provide discovery on Mme. Bescond's

selective prosecution claim and "provide additional information and briefing on [Mme.] Bescond's statute of limitations defense" for the Court to decide those issues. *Id.*

On June 10, 2019, Mme. Bescond filed a notice of appeal of the May 2019 Decision. Dkt. No. 25. On August 5, 2021, the Second Circuit reversed this Court's decision, finding that Mme. Bescond is <u>not</u> a fugitive and is therefore entitled to challenge the Indictment from abroad. Dkt. No. 26. The Second Circuit amended its decision on February 3, 2022, to address a petition for rehearing filed by the government; however, the outcome remained the same, holding that Mme. Bescond "is not a fugitive under existing law." *United States v. Bescond*, 24 F.4th 759, 772, 775 (2d Cir. 2021). The Second Circuit declined to address Mme. Bescond's substantive arguments for dismissal, instead remanding the case for further proceedings "to consider or reconsider the merits of her motions to dismiss." *Id.* at 775. Notably, although remanding to this Court for reconsideration of her extraterritoriality claim, the Second Circuit <u>twice</u> noted that Mme. Bescond's extraterritoriality argument was "nonfrivolous," particularly considering its precedential decision in *Prime*, which was decided after the issuance of this Court's May 2019 Decision. *Id.* at 772-773 & 775 (citing *Prime,* 937 F.3d 94). Indeed, the Second Circuit explicitly recognized the foreign nature of the allegations in the Indictment, noting that the alleged LIBOR manipulation "affected the United States—allegedly—<u>only through a chain of other actors in other countries</u>." *Id.* at 774 (emphasis added).

The Second Circuit's mandate, remanding the case to this Court for further consideration of Mme. Bescond's dismissal arguments, issued on March 23, 2022. Dkt. No. 28.

## ARGUMENT

**I.     The Court's Alternative Extraterritoriality and Due Process Rulings Merit Reconsideration After *Prime***

**A.     *Prime* Establishes the Proper Standard for Analyzing the Extraterritorial Application of the CEA**

Noting that *Prime* was decided after the Court's May 2019 Decision, the Second Circuit remanded this case, *inter alia*, for reconsideration of Mme. Bescond's extraterritoriality argument in light of that precedential decision.  *Bescond*, 24 F.4th at 773.  Although "[t]he standard to be applied in deciding reconsideration motions in criminal cases has not been clearly established," courts in this circuit generally apply "the Local Rule 6.3 standard for motions for reconsideration in civil cases." *United States v. Zedner*, No. 06-cr-717 (ADS), 2006 WL 6201757, at *3 (E.D.N.Y. Nov. 17, 2006) (citation and quotation marks omitted); *see also, e.g.*, *United States v. Sessa*, No. 92-CR-351 (ARR), 2022 WL 970778, at *1 (E.D.N.Y. Mar. 31, 2022); *United States v. Reichberg*, No. 16-cr-468 (GHW), 2018 WL 6599465, at *8 (S.D.N.Y. Dec. 14, 2018).  Pursuant to this standard, a motion for reconsideration is appropriate where a party can point to "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice."  *Virgin Atl. Airways, Ltd. v. Nat'l Med. Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992) (quoting 18 C. Wright, A. Miller & E. Cooper, Federal Practice & Procedures § 4478 at 790); *Jacob v. Duane Reade, Inc.*, 293 F.R.D. 578 (S.D.N.Y.  2013) (granting in part defendants' motion for reconsideration in light of intervening change in controlling precedent). The purpose of a motion for reconsideration is to draw the Court's attention to authority that could "alter the conclusion reached by the court."  *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995).

As recognized by the Second Circuit in remanding this case, *Prime* provides a clear basis for reconsideration of the Court's Alternative Ruling.  *Bescond*, 24 F.4th at 773; *see also Laydon*

7

*v. Mizuho Bank, Ltd.*, No. 12 Civ. 3419 (GBD), 2020 WL 5077186, at *2 (S.D.N.Y. Aug. 27, 2020) ("[T]here has been an intervening change of controlling law regarding the extraterritorial application of the CEA.") (emphasis in original) (citing *Prime*, 937 F.3d at 105); *In re: Platinum and Palladium Antitrust Litigation*, 449 F.Supp.3d 290, 328 (S.D.N.Y. Mar. 29, 2020) ("*Prime International Trading* requires the Court reconsider its holding in *Platinum I* that Plaintiffs' CEA claims, as alleged, are not impermissibly extraterritorial.").   *Prime* not only warrants reconsideration, but it also compels the dismissal of the Indictment.

**B.    *Prime* Establishes That the Indictment Impermissibly Charges Extraterritorial Claims Under the CEA**

*Prime*, discussed in detail below, removes all doubt that this case constitutes an improper extraterritorial application of the CEA requiring dismissal of the Indictment.  The presumption against extraterritoriality provides that, "[a]bsent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application."  *See RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325, 335 (2016) (citing *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255 (2010)).  The Supreme Court has established a two-step framework to assess the legality of the extraterritorial application of a statute.  *Id.* at 337.  First, a court must inquire as to whether Congress has clearly stated its intent that a statute be applied extraterritorially.  *Id.*  If no such Congressional intent has been expressly stated, persons outside of the United States cannot be prosecuted unless a second step is met:  a showing that the "<u>conduct</u> relevant to the statute's focus <u>occurred in the United States</u>." *Id.* (emphasis supplied).

Second Circuit precedent provides that the CEA contains no definitive statement of extraterritorial application, and the government does not contend otherwise.  *See Loginovskaya v. Batratchenko*, 764 F.3d 266, 272 (2d Cir. 2014) ("Given the absence of any 'affirmative intention'

by Congress to give the CEA extraterritorial effect, we must 'presume it is primarily concerned with domestic conditions.'") (quoting *Morrison*, 561 U.S. at 255).   Thus, this Court's extraterritoriality decision hinged upon the second step – identification of CEA Section 9(a)(2)'s "focus" and where the conduct relevant to that focus occurred.  *See Sindzingre*, 2019 WL 2290494, at *11.   The Court concluded that the focus of the CEA is "any commodity in interstate commerce[,]" and that the relevant domestic conduct "is the manipulation of the price of any commodity bought or sold in the United States, <u>regardless of the location from which a defendant causes a false report to be transmitted in or into the United States</u>."  *Id.* at *12 (emphasis added).

After this Court issued the May 2019 Decision, however, the Second Circuit decided *Prime*, effectively overruling this Court's determination of the "focus" of the CEA and the conduct relevant in determining whether the Indictment's CEA charges are impermissibly extraterritorial.[3] In *Prime,* the plaintiffs sued under Section 9(a)(2) of the CEA, claiming that the defendants conspired to and did manipulate the market for a type of crude oil whose futures contracts are traded on the New York Mercantile Exchange ("NYMEX"), a U.S.-based commodity futures exchange.  97 F.3d at 98-100.  The plaintiffs alleged that the defendants systematically engaged in artificial trades of crude oil and then reported that false trade data to "Platts," a London-based price-reporting agency that incorporated this data into a foreign benchmark called the "Dated Brent Assessment" ("DBA") that was ultimately used to settle futures contracts traded on the NYMEX.

---

[3] That *Prime* was a civil case and this is a criminal prosecution is a distinction of no consequence. The Second Circuit has expressly ruled that the presumption against extraterritoriality is also applicable in criminal cases, and that a statute's extraterritorial reach should be interpreted in the same way whether the statute is being applied civilly or criminally.  *United States v. Vilar*, 729 F.3d 62, 70, 72-74 (2d Cir. 2013) ("the presumption against extraterritoriality *does* apply to criminal statutes, except in situations where the law at issue is aimed at protecting 'the right of the government to defend itself.'"; "The presumption against extraterritoriality is a method of interpreting a statute, which has the same meaning in every case. . . .   A statute either applies extraterritorially or it does not," regardless of whether it is being applied criminally or civilly).

*Id.* at 100. Although all the alleged manipulative conduct occurred outside of the United States, the plaintiffs argued that the "ripple effects" of this conduct were felt in the United States because the DBA benchmark was used to price futures contracts traded in the United States. *Id.*

After engaging in a lengthy analysis of the extraterritoriality standard set out in *RJR Nabisco*, the *Prime* court held:

> Plaintiffs have also failed to plead a domestic application of Section 9(a)(2) [of the CEA]. That Section proscribes "manipulat[ing] or attempt[ing] to manipulate the price of any commodity in interstate commerce." 7 U.S.C. § 13(a)(2). **The focus of Section 9(a)(2) is preventing manipulation of the price of any commodity. And all of the relevant conduct here relating to *that* focus occurred abroad. . . . Plaintiffs make no allegation of manipulative conduct or statements made in the United States.** To the contrary, they expressly rely on a "ripple effect" or chain of events that resembles a falling row of dominoes commencing in the North Sea. Accordingly, Plaintiffs fail to plead a proper domestic application of Section 9(a)(2). . . .

*Id.* at 108 (bold emphasis added; italics emphasis in original).[4] The distinctions between this Court's CEA extraterritoriality analysis and that established by *Prime* are depicted below:

|  | **May 2019 Decision Analysis** | ***Prime* Analysis** |
|---|---|---|
| **Focus of CEA § 9(a)(2)** | Any commodity in interstate commerce. | Preventing manipulation of the price of any commodity. |
| **Conduct Relevant to Focus** | Manipulation of the price of any commodity without regard for where manipulative conduct occurred. | Manipulative conduct occurring in the U.S. |

Contrary to this Court's determination that the manipulation of any commodity bought or sold in the United States is sufficient to establish a domestic application of the CEA – regardless of where the manipulative conduct actually occurred – the Second Circuit explained that allowing an action to proceed "any time a domestic transaction is pleaded would turn the presumption

---

[4] The Supreme Court subsequently denied a petition for certiorari in *Prime*, cementing its precedential status in the Second Circuit. *Atl. Trading USA, LLC v. BP P.L.C.*, 141 S. Ct. 113, 207 L. Ed. 2d 1053 (2020).

against extraterritoriality into a 'craven watchdog'" and "fly in the face of the Supreme Court's clear guidance that the presumption against extraterritoriality cannot evaporate any time" some domestic activity is implicated in the action. *Id.* at 106 (quoting *Morrison*, 561 U.S. at 266). *Prime* thus makes clear that in CEA manipulation cases, the second step of the extraterritoriality analysis assesses <u>whether the manipulative conduct occurred in the United States</u>, <u>not</u> simply whether the manipulative conduct affected the price of a commodity in the United States. Thus, this Court's May 2019 Decision cannot be squared with *Prime*.

*Prime* is consistent with and clarifies the Supreme Court's ruling in *RJR Nabisco* that,

> If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad; **but if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory**.

136 S. Ct. at 2101(emphasis added). It indisputable that all of Mme. Bescond's alleged conduct occurred in France, the only country in which she has ever lived or worked. Indeed, the Indictment fails to cite a single act engaged in by Mme. Bescond or her alleged co-conspirators that occurred in the United States. As alleged in the Indictment, the sequence of events was as follows: (i) the instruction from Société Générale's General Directorate to lower the LIBOR submissions (this took place in France), Indictment ¶ 18; (ii) the directive from Defendant Sindzingre to Mme. Bescond to do so (this took place in France), *id.*; (iii) the alleged instructions from Mme. Bescond to the setters (this took place in France), *id.* ¶ 19; (iv) the selection of inaccurate rates by the setters (this took place in France), *id.* ¶¶ 15, 16; (v) the transmission of inaccurate rates by the setters to Manager-1 (this took place in France and the U.K.), *id.* ¶ 16; (vi) Manager-1's submission of information to the BBA via Thomson Reuters (this took place in the U.K.), *id.*; (vii) Thomson

Reuter's calculation of LIBOR rates (this took place in the U.K.), *id.* ¶ 11; (viii) Thomson Reuter's dissemination of LIBOR rates to three data centers, including one in New York (this took place in the U.K. and at the locations of the three data centers), *id.*; (ix) the use of LIBOR rates to settle trades for Eurodollar contracts worldwide, including on the Chicago Mercantile Exchange (this took place in the U.S and elsewhere), *id.* ¶ 12.  Thus, even accepting the Indictment's allegations as true, all of the supposed "rate manipulation" took place <u>outside</u> of the United States.  Indeed, the Second Circuit's own statements in remanding this case recognize that the allegations in the Indictment are predominantly foreign-based, as was the case in *Prime*, specifically noting that the alleged LIBOR manipulation "affected the United States—allegedly—<u>only through a chain of other actors in other countries</u>."  *Bescond*, 24 F.4th at 774 (emphasis supplied).

Such was the situation in *Prime*, where the alleged manipulative conduct occurred in Europe, several steps removed from the United States, where "effects" were felt.  In *Prime*, the defendants moved to dismiss the complaint on the grounds that the plaintiffs' claims under the CEA, including Section 9(a)(2), were impermissibly extraterritorial.  The plaintiffs maintained that they properly alleged a "domestic application" of the CEA because their claims involved a causal chain of events that ultimately affected the settlement of trades on NYMEX, a domestic exchange. 937 F.3d at 100.  But because it was only through a "ripple effect" from this lengthy chain that harm allegedly occurred in the United States, the Second Circuit rejected this analysis and held that the complaint's allegations did not assert a domestic application of the CEA.  *Id.* at 107-08.

Here, the Indictment fares no better.  All of the alleged manipulative conduct occurred outside the United States, with the chain of events mirroring that in *Prime* as shown in this chart:

| *Prime* Allegations | Location | Causal Step | *Bescond* Allegations | Location | Causal Step |
|---|---|---|---|---|---|
| Defendants engaged in fraudulent trades of Brent crude. *Prime*, 937 F.3d at 100. | Europe | 1 | General Directorate instructed that LIBOR submissions be lowered. Indictment ¶¶ 14 & 18. | France | 1 |
| | | | Mme. Sindzingre instructed Mme. Bescond and setters to submit lower estimates. Indictment ¶ 18. | | 2 |
| | | | Mme. Bescond followed instructions by telling setters to lower LIBOR submissions. Indictment ¶ 19. | | 3 |
| | | | The determination of inaccurate rates by setters. Indictment ¶¶ 15, 16. | | 4 |
| Defendants reported artificial trades to Platts. *Prime*, 937 F.3d at 100. | Europe | 2 | Setters transmitted false LIBOR submissions to Manager-1. Indictment ¶ 16. | France and U.K. | 5 |
| | | | Manager-1 transmitted submission to the BBA via Thomson Reuters. Indictment ¶ 16. | | 6 |
| Platts incorporated fraudulent data into calculation of DBA. *Prime*, 937 F.3d at 100. | Europe | 3 | Thomson Reuters ranked all LIBOR submissions, and averaged the middle 8. Indictment ¶ 11. | U.K. | 7 |
| ICE Futures Europe incorporated the manipulated DBA into the ICE Brent Index. *Prime*, 937 F.3d at 100. | Europe | 4 | Thomson Reuters transmitted LIBOR rates to data centers for worldwide publication. Indictment ¶ 11. | U.K., U.S. and elsewhere | 8 |
| The manipulated ICE Brent Index is used to settle Brent Futures traded on ICE and NYMEX. *Prime*, 937 F.3d at 100. | U.S. and elsewhere | 5 | LIBOR rates used to settle trades in Eurodollar futures contracts, some on Chicago Mercantile Exchange. Indictment ¶ 12. | U.S. and elsewhere | 9 |

13

Second Circuit precedent also forecloses the argument that *any* activity in the United States is sufficient to overcome the presumption against extraterritoriality. In *Parkcentral Global Hub Ltd. v. Porsche Automobile Holdings SE*, 763 F.3d 198 (2d Cir. 2014), the Second Circuit found conduct much less removed from the United States than here to be "predominantly foreign" and violative of the presumption against extraterritoriality. *Id.* at 216. In *Parkcentral*, investors in equity swaps pegged to the price of Volkswagen stock sued under Section 10(b) of the Securities Exchange Act of 1934, alleging that the defendants made misleading statements that sought to hide their intentions to take over Volkswagen. 763 F.3d at 201–02. Despite assuming that the equity swaps at issue were "domestic transactions," the Second Circuit nonetheless dismissed the case as impermissibly extraterritorial because all of the defendants' misconduct occurred in Germany, and Volkswagen stock only traded on European stock exchanges, rendering the suit "predominately foreign." *Id.* at 216. The Second Circuit came to this conclusion despite allegations that the false statements made in Germany were intended to deceive investors worldwide, including in the United States, noting that the presence of a "minor domestic element" could not override the presumption against extraterritoriality where a transaction was "overwhelmingly foreign." *Id.*

The Second Circuit further explained this principle in *Prime*, wherein it concluded that *Parkcentral*'s analysis "carries over to the CEA." 937 F.3d at 105. In *Prime*, the Second Circuit found that the claims at issue were predominantly foreign because "[n]early every link in Plaintiffs' chain of wrongdoing is entirely foreign," with the alleged wrongdoing only reaching the United States at the "fifth step in the causal chain." *Id.* at 106. The Second Circuit explained that in *Parkcentral*, it had deemed transactions much less removed from the United States to be "predominantly foreign" and therefore impermissibly extraterritorial "where the alleged

14

wrongdoing occurred on American shores at the second causal step[.]"  *Id.* (emphasis added). There can be no dispute that the government's case in *Bescond* is so predominantly foreign as to be impermissibly extraterritorial where the alleged misconduct all occurred abroad and only reached American shores after  multiple intervening causal steps.

The Second Circuit described the allegations in *Prime* as "an attenuated 'ripple effects' theory," where "[n]early every link in Plaintiffs'' chain of wrongdoing is entirely foreign.  *Id.* at 106-107.  Like in *Prime*, the Indictment's allegations amount to no more than "an attenuated 'ripple effects' theory."  Indeed, the Court's reason for rejecting Mme. Bescond's extraterritoriality argument was that her conduct abroad ultimately led to ripple effects in U.S. commerce:  "[B]y alleging an effect on USD LIBOR, the Indictment alleges an effect on the price of commodities bought and sold in the United States, as represented by Eurodollar futures contracts traded on the CME." (emphasis added).  *See Sindzingre*, 2019 WL 2290494, at *12 (emphasis added).  This is the very theory later rejected by *Prime.  Id.* (the Court finds the Indictment charged Mme. Bescond with domestic violations of the CEA because, "[i]t alleges that by causing the Bank to submit false and misleading USD LIBOR estimates that were transmitted into and published in the United States, (Indictment ¶¶11, 14), she affected the prices of commodities in commerce in the United States[.]") (emphasis added).  Indeed, this Court's reliance on an "effects test" to measure domesticity was rejected long ago by the Supreme Court in *Morrison*.  561 U.S. at 258-259.

Given this binding precedent, the Court simply cannot adhere to its prior extraterritoriality ruling.  Mme. Bescond respectfully submits that *Prime* requires dismissal of the Indictment as impermissibly extraterritorial.

### C. District Courts Have Dismissed Similar CEA Claims as Impermissibly Extraterritorial After *Prime*

Other district courts in this circuit have already begun to follow *Prime*'s precepts in dismissing CEA cases similar to this one as impermissibly extraterritorial.  First is *In re: Platinum and Palladium Antitrust Litigation*, No. 1:14-CV-9391-GHW, 2017 WL 1169626, at *27 (S.D.N.Y. Mar. 28, 2017) ("*Platinum I*"), on reconsideration, 449 F. Supp. 3d 290 (S.D.N.Y. 2020), a case involving allegations under Section 9(a)(2) of the CEA of collusion to manipulate the global benchmark prices for precious metals below market value.  The plaintiffs alleged that the defendants' actions caused them losses on derivatives contracts traded on the NYMEX, a domestic exchange.  The district court originally determined that the plaintiffs' CEA claims were not impermissibly extraterritorial, reasoning that the focus of the CEA is transactional, and the relevant transactions were domestic NYMEX transactions; therefore, the court concluded that it did not matter that the defendants' conduct occurred outside the United States.  *Id.* at *26-*27.  After the Second Circuit decided *Prime*, however, the district court <u>reversed itself following a motion for reconsideration</u>, finding that *Prime* "<u>compels the conclusion</u> that Plaintiffs' CEA claims are impermissibly extraterritorial."  *In re Platinum & Palladium Antitrust Litig.*, 449 F. Supp. 3d at 328 ("*Platinum II*") (emphasis added).

The *Platinum II* decision recognized that *Prime* requires not only a domestic transaction, but also <u>domestic conduct</u> violative of the CEA, to overcome the presumption against extraterritoriality.  *Id.* at 330 (citing *Prime*, 937 F.3d at 105).  Applying the standard from *Prime*, *Platinum II* acknowledged that the plaintiffs' CEA claims were predominantly foreign because the manipulative conduct occurred in London, which then led to the setting of "the price of physical platinum located in London or Zurich."  *Id.* at 331.  Moreover, *Platinum II* recognized that mere

16

allegations of losses suffered in the United States because of this foreign manipulation were insufficient to overcome the presumption against extraterritoriality, specifically noting that *Morrison* had rejected the "effects test" for extraterritoriality.  *Id.* (citing *Morrison*, 561 U.S. at 259).  The case before the Court similarly involves only allegations of effects in the U.S. with all alleged manipulative conduct occurring abroad.

Even more striking  than *Platinum* is *Laydon v. Mizuho Bank, Ltd.*, No. 12 Civ. 3419, 2020 WL 5077186 (S.D.N.Y. Aug. 27, 2020), which involved allegations that Société Générale, among other financial institutions, violated the CEA by manipulating Euroyen TIBOR (the Tokyo Interbank Offered Rate) and Yen LIBOR (the London Interbank Offered Rate for Japanese Yen) – both financial benchmarks similar to U.S. Dollar LIBOR at issue here.  *Id.* at *1.  The plaintiff alleged that the defendants made artificial submissions to the BBA in London – the same entity involved in the *Bescond* Indictment – and the Japanese Bankers' Association ("JBA") in Tokyo to manipulate TIBOR and Yen LIBOR and thereby profit from derivatives involving Japanese Yen. *Id.*  The plaintiff sought to recover losses for this manipulation that he "allegedly suffered when he initiated short positions in Euroyen TIBOR futures contracts on the Chicago Mercantile Exchange ("CME")."  *Id.*

The defendants moved for judgment on the pleadings, contending that the plaintiff's claims were so predominantly foreign as to be impermissibly extraterritorial.  *Id.*  The district court began its assessment of the defendants' extraterritoriality argument by announcing: "Since the inception of this action, there has been an intervening change of controlling law regarding the extraterritorial application of the CEA."  *Id.* at *2 (citing *Prime*, 937 F.3d at 105).  Adhering to *Prime*, the district court stated that allegations of domestic <u>conduct</u> are necessary for the CEA to be applied domestically.  *Id.*  As in *Prime*, the district court in *Laydon* held that the plaintiff's CEA claims

17

alleging manipulation of benchmark rates "by foreign financial institutions, on foreign soil" were "predominantly foreign," involving only attenuated ripple effects in the United States. *Id.* As a result, the district court found the plaintiff's CEA claims to be impermissibly extraterritorial and granted the defendants' motion for judgment on the pleadings. *Id.* at *2-*3. The Indictment suffers from the same infirmities, dictating dismissal under *Prime* and its progeny.

### D. *Prime* Also Supports Reconsideration of the Court's Due Process Decision

This Court's May 2019 Decision rejecting Mme. Bescond's motion to dismiss based on due process also warrants reconsideration in light of *Prime*, as this Court's due process determination was premised upon the erroneous conclusion that the Indictment alleges domestic offenses.

In the Second Circuit, to prosecute a foreign citizen for conduct occurring abroad, due process requires that the government show "a sufficient nexus between the defendant and the United States, so that such application [of criminal law] would not be arbitrary or fundamentally unfair." *United States v. Al Kassar,* 660 F.3d 108, 118 (2d Cir. 2011) (internal quotation marks and citation omitted). This nexus analysis focuses on whether "the <u>aim</u> of [the defendant's] activity is to cause harm inside the United States or to U.S. citizens or interests." *Id*. (emphasis added). More specifically, "[f]or non-citizens acting entirely abroad, a jurisdictional nexus exists when <u>the aim of that activity</u> is to cause harm inside the United States or to U.S. citizens or interests." *Id.* (emphasis added); *see also United States v. Mostafa¸* 965 F. Supp. 2d 451, 459 (S.D.N.Y. 2013) (holding that the "determinative issue" under the sufficient nexus analysis "is whether defendant's actions were calculated to harm American citizens and interests.").

Because this Court determined that the Indictment alleged domestic offenses rather than extraterritorial offenses, it found that no nexus with the United States needed to be alleged in order

18

to comply with due process. *Sindzingre*, 2019 WL 2290494, at *13. As explained above, *Prime* establishes that the Indictment involves an extraterritorial application of the CEA. As a result, a sufficient nexus is required under *Al Kassar* to comport with due process.

Review of the Indictment makes clear that *Al Kassar*'s "aim" test is not met in this case. Nowhere does the Indictment allege that Mme. Bescond aimed any of her alleged conduct at the United States (or the Eastern District of New York), or that such conduct was aimed at causing harm to American interests. To the contrary, the Indictment alleges that "[t]he purpose of the scheme was to avoid anticipated reputational harm to Société Générale had the Bank submitted honest estimates of its borrowing rates, which rates were publicized through the LIBOR rate setting process." Indictment ¶ 14.

The May 2019 Decision states that "an aim to cause harm within the United States or to its citizens or interests is sufficient, but not necessary, to establish a nexus," *Bescond*, 2019 WL 2290494, at *13, suggesting that a sufficient nexus may be established in other ways. However, the Second Circuit has never so found and this suggestion is inconsistent with the language of *Al Kassar*. More significantly, the May 2019 Decision nowhere provides another basis for concluding that a sufficient jurisdictional nexus with the United States exists such that due process is satisfied. Given that the Indictment is premised upon an "attenuated ripple effects theory," in which only remote and indirect effects of Mme. Bescond's alleged conduct even reached the United States, it is clear that no proper jurisdictional nexus exists and that this prosecution violates due process requirements.

19

## II.    Absent Dismissal, the Government Should be Ordered to Provide Discovery and Additional Briefing on Mme. Bescond's Motions to Dismiss Based on the Statute of Limitations and Selective Prosecution

Were the Court to somehow conclude that the Indictment should not be dismissed, the Court should order the government to provide: (i) additional information and briefing on Mme. Bescond's motion to dismiss based on the statute of limitations; and (ii) discovery relevant to Mme. Bescond's motion to dismiss based on selective prosecution.  This is consistent with the Court's May 2019 Decision.  *See Sindzingre*, 2019 WL 2290494, at *9 (stating that because Mme. Bescond was a fugitive, the Court "declines to reach the merits of her motions, order discovery on her selective prosecution claim, or order the Government to provide additional information and briefing on Bescond's statute of limitations defense.").  Indeed, this Court explicitly stated that "it would require additional briefing and information" in order to rule on Mme. Bescond's statute of limitations and selective prosecution arguments.  *Id.* (quoting Bescond briefing, stating: "(E.g., SOL Reply at 4-5 & n.5 ('[T]he government would need to produce for inspection the ex parte submissions by the government to obtain the tolling orders, the requests made to foreign authorities, the responses to these requests, and all evidence of "final action."'); SP Br. at 14 ('[T]he burden [shifts] to the government to justify what appears to be patent gender discrimination. . . .  At a minimum, Mme. Bescond should be permitted to conduct discovery into how and why the government chose to single out only female participants for prosecution given that similarly situated males were excluded altogether.')").

With respect to the statute of limitations, and as set forth more fully in Mme. Bescond's prior briefing on this issue, additional information is required if the government is to meet its burden.  *See* Dkt. Nos. 6, 14, & 23.  In particular, to demonstrate compliance with the exception to the statute of limitations contained in 18 U.S.C. § 3292, upon which the government purports

to rely, the government must provide evidence that proper requests for evidence were made to foreign authorities (including the date and content of those requests) and the date and content of "final action" taken by foreign authorities to these requests.  18 U.S.C. §§ 3292 (b) and (c).  Only the production of this information will permit the Court to fully assess the government's compliance with the statute of limitations.

As a result, the Court should order the government to provide the following information to permit the assessment of Mme. Bescond's statute of limitations defense:

1. All Mutual Legal Assistance Treaty ("MLAT") requests made by the United States before August 24, 2017, that pertain to Mme. Bescond, or the alleged criminal conduct identified in the above-captioned matter (the "MLAT Requests");

2. All correspondence accompanying the transmission of the MLAT Requests;

3. All correspondence sent by the foreign authority(ies) in response to any of the MLAT Requests; and

4. Any pleadings and/or other submissions that the government filed with or made to any court pursuant to 18 U.S.C. § 3292 related to the above-captioned matter.

With respect to Mme. Bescond's selective prosecution argument, the Court  indicated that discovery is appropriate.  *See Sindzingre*, 2019 WL 2290494, at *9.  To determine the merits of the motion, the government must produce documents and information demonstrating why it chose to single out only female participants for prosecution.  Such discovery would include: (1) an explanation of how the decision to prosecute Mmes. Bescond and Sindzingre in the present case was made and how the decisions not to prosecute other co-conspirators were made, including the agencies involved and the policies applicable in determining which particular persons would be prosecuted and which persons would not; (2) any prosecution or other memos prepared in

21

connection with this case, in connection with the deferred prosecution agreement the government entered into with Société Générale (the "DPA"), or in connection with the related Commodities Futures Trading Commission Order (the "CFTC Order"), *see* Dkt. No. 12, Exhibit A (the DPA) & Exhibit B (the CFTC Order); (3) any FBI 302s or other agency memoranda prepared in connection with this case, the DPA, or the related CFTC Order; and (4) statements explaining why each Société Générale executive identified as culpable in the DPA or the related CFTC Order was not prosecuted; and (5) any other information upon which the government relies in attempting to establish that it did not engage in selective prosecution in this case.

## **CONCLUSION**

For the foregoing reasons, Mme. Bescond respectfully requests that the Indictment against her be dismissed in its entirety as an improper extraterritorial application of the CEA, and as violative of due process.  Were the Court to deny dismissal on the foregoing grounds, despite *Prime*'s dispositive ruling, the Court should order the government to provide additional information and discovery necessary to permit the Court to rule upon Mme. Bescond's motions based on the statute of limitations and selective prosecution.  *See Sindzingre*, 2019 WL 2290494, at *9.

Respectfully submitted,

BLANK ROME LLP                                    LAURENT COHEN-TANUGI AVOCATS

By:      *s/ Laurence S. Shtasel*                         *s/ Laurent Cohen-Tanugi*
          Laurence S. Shtasel                              Laurent Cohen-Tanugi
          Reg. # 2333110                                  Reg. # 1971555
          Bridget M. Briggs (*pro hac vice pending*)      20, Boulevard des Invalides
          One Logan Square                                75007 Paris, France
          Philadelphia, PA  19103                         Tel: +33 (0) 1 47 05 38 00
          Tel: (215) 569-5691

 Dated:  June 1, 2022                              *Attorneys for Muriel Bescond*

## <u>CONFERENCE OF COUNSEL</u>

Pursuant to Local Criminal Rule 16.1, the undersigned counsel certifies that he conferred with opposing counsel on June 1, 2022 by telephone conference in an effort in good faith to resolve by agreement Mme. Bescond's alternative request for additional information and discovery relevant to her motions to dismiss based upon the statute of limitations and selective prosecution without the intervention of the Court.  At present, the government indicated that it is not inclined to voluntarily provide the requested information without further direction from the Court.


s/ Laurence S. Shtasel
LAURENCE S. SHTASEL

23

## <u>CERTIFICATE OF SERVICE</u>

I, LAURENCE S. SHTASEL, hereby certify that on this 1st day of June 2022, I caused a true and correct copy of the foregoing Motion for Reconsideration to be served by electronic mail upon:

Kyle Maurer
U.S. Dept. of Justice
1400 New York Ave NW
Washington, DC 20005
Tel: 202-598-2930
Email: kyle.maurer@usdoj.gov

Shannon Cassandra Jones
United States Attorney's Office
Eastern District of New York
271 Cadman Plaza East
Brooklyn, NY 11201-1820
Tel: 718-254-6379
Email: shannon.jones@usdoj.gov

Timothy A. Duree
U.S. Dept. of Justice, Criminal Division, Fraud Section
1400 New York Ave
Washington, DC 20005
Tel: 202-616-2660
Email: timothy.duree2@usdoj.gov

<u>s/ Laurence S. Shtasel</u>
LAURENCE S. SHTASEL