IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

_____
                                          :
UNITED STATES OF AMERICA          :          Criminal No. 2:17-cr-00464-JS
                                          :
            v.                            :
                                          :
DANIELLE SINDZINGRE and          :
MURIEL BESCOND,                      :
                                          :
            Defendants              :
_____:

## REPLY MEMORANDUM IN SUPPORT OF MOTION FOR RECONSIDERATION OF DEFENDANT MURIEL BESCOND'S MOTIONS TO DISMISS THE INDICTMENT

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................ 1

ARGUMENT ........................................................................................................... 2

    I.      *Prime* Dictates the Dismissal of the Indictment as Impermissibly
          Extraterritorial ........................................................................................ 2

          A.     In Attempting to Reconcile This Court's May 2019 Decision with
                *Prime*, the Government Ignores the Standard Therein and Invents
                Its Own Standards.................................................................... 2

          B.     The Government Fails to Distinguish *Platinum* and *Laydon* .................... 5

    II.     This Prosecution Also Violates Due Process ...................................... 7

    III.    If the Court Declines to Dismiss the Indictment Under *Prime*, the Court
          Should Grant Mme. Bescond's Statute of Limitations and Selective
          Prosecution Motions, or at a Minimum, Order the Government to Provide
          Discovery and Additional Briefing ...................................................... 8

    CONCLUSION....................................................................................... 12

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bascunan v. Elsaca*,
    927 F.3d 108 (2d Cir. 2019) ................................................................. 5

*Laydon v. Mizuho Bank, Ltd.*,
    No. 12 CIV. 3419 (GBD), 2020 WL 5077186 (S.D.N.Y. Aug. 27, 2020) ..................... 5, 6, 7

*Morrison v. Nat'l Austl. Bank Ltd.*,
    561 U.S. 247 (2010) ........................................................................ *passim*

*Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE*,
    763 F.3d 198 (2d Cir. 2014) ................................................................. 5

*In re Platinum & Palladium Antitrust Litig.*,
    449 F. Supp. 3d 290 (S.D.N.Y. 2020) ..................................................... 5, 6, 7

*Prime Int'l Trading, Ltd. v. BP P.L.C. et al.*,
    937 F.3d 94 (2d Cir. 2019) .................................................................. *passim*

*RJR Nabisco, Inc. v. Eur. Cmty.*,
    579 U.S. 325 (2016) ........................................................................ 5

*United States v. Al Kassar*,
    660 F.3d 108 (2d Cir. 2011) ................................................................. 7, 8

*United States v. Bescond*,
    24 F.4th 759 (2d Cir. 2021) ................................................................. 2, 7, 8

*United States v. Sindzingre*,
    No. 17-CR-0464(JS), 2019 WL 2290494 (E.D.N.Y. May 29, 2019) ............................ 2, 8, 9

**Statutes**

Commodity Exchange Act, 7 U.S.C. § 1, *et seq.* ................................................ *passim*

18 U.S.C. § 3292 ............................................................................... 9

**Other Authorities**

Fed. R. Crim. P. 16.1 ................................................................................................ 9

## PRELIMINARY STATEMENT

The government's response to Mme. Bescond's motion for reconsideration reflects a struggle to salvage this prosecution despite an intervening Second Circuit decision establishing that it is impermissibly extraterritorial. *See Prime Int'l Trading, Ltd. v. BP P.L.C. et al.*, 937 F.3d 94 (2d Cir. 2019). *Prime* holds that the focus of CEA Section 9(a)(2) is "preventing manipulation of the price of any commodity," and that the relevant factor in determining whether the CEA is being applied domestically or extraterritorially is the <u>location of the alleged manipulative conduct</u>. 937 F.3d at 108 (emphasis added). In *Prime*, the Second Circuit explicitly found that "Plaintiffs ma[d]e no allegation of manipulative conduct or statements made in the United States," and therefore failed to plead a domestic application of Section 9(a)(2) of the CEA. That is exactly the case here.

Because the Court's prior reasoning cannot be reconciled with *Prime*, the government resorts to ignoring *Prime*'s standard and fabricating its own – claiming, *inter alia*, that this is not an improper extraterritorial prosecution because the connection to the United States in this case was "neither unforeseen to Bescond nor incidental." Resp. at 1, 12. This is not the standard set out in *Prime*, and it certainly does not follow Supreme Court extraterritoriality jurisprudence. Indeed, the government's made-up standards revert to an "effects test" for extraterritoriality cases – a standard previously rejected by the Supreme Court. *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 258-59 (2010). Putting aside the government's fallacious reading of *Prime*, when one follows the standard set out therein, the conclusion that this is an improper extraterritorial application of the CEA is inescapable because <u>all</u> the alleged manipulative conduct occurred abroad. As a result, the Indictment should be dismissed in its entirety.

Should the Court decline to dismiss the Indictment despite *Prime*'s dictates, it should grant

Mme. Bescond's statute of limitations and selective prosecution motions, or order the government to provide the requested discovery related to those motions, which this Court has already indicated would be the appropriate procedure to permit it to decide these issues. *See United States v. Sindzingre*, No. 17-CR-0464(JS), 2019 WL 2290494, at *9 (E.D.N.Y. May 29, 2019).

## ARGUMENT

I.      ***Prime* Dictates the Dismissal of the Indictment as Impermissibly Extraterritorial**

    A.      **In Attempting to Reconcile This Court's May 2019 Decision with *Prime*, the Government Ignores the Standard Therein and Invents Its Own Standards**

As a threshold issue, the government does not (and cannot) dispute that the standard for reconsideration is satisfied here.[1]  Instead, the government attempts in vain to square this Court's original alternative ruling on extraterritoriality with the contradictory ruling of the Second Circuit in *Prime*.[2] In particular, although the government now admits that "the focus of 7 U.S.C. § 13(a)(2) is on 'preventing manipulation of the price of any commodity,'" Resp. at 8 (quoting *Prime*, 937 F.3d at 108), it then ignores the portion of *Prime* clearly stating that the conduct relevant to an extraterritoriality analysis under the CEA is the alleged <u>manipulation</u>, and that this conduct <u>must occur in the United States</u> in order for an alleged CEA violation to be domestic rather than extraterritorial. *Prime* stated: "<u>The focus of Section 9(a)(2) is preventing manipulation of the price of any commodity. And all of the relevant conduct here relating to *that* focus occurred abroad. . . . Plaintiffs make no allegation of manipulative conduct or statements made in the United States.</u>"

---

[1] Given that the Second Circuit's remand decision effectively directed the Court to reconsider Mme. Bescond's extraterritoriality argument in light of *Prime*, any such argument would be meritless. *See United States v. Bescond*, 24 F.4th 759, 775 (2d Cir. 2021).

[2] While taking no official view of Mme. Bescond's extraterritoriality argument, as is custom upon remand, the Second Circuit made clear that the Court should take Mme. Bescond's argument seriously, <u>twice</u> noting that the argument is non-frivolous. *Bescond*, 24 F.4th at 772-773 & 775.

*Id.* at 108 (underline emphasis added; italics emphasis in original).

Rather than acknowledging this standard and attempting to address it, the government ignores it and misleadingly substitutes three different and fabricated standards, none of which is supported by any authority. Specifically, the government asserts this is not an improper extraterritorial prosecution because: (1) the connection to the United States in this case was "neither unforeseen to Bescond nor incidental," Resp. at 1, 12; (2) the charged conduct involved the intended "transmission 'into the United States [of] false reports that affected the prices of commodities in the United States,'" *id.* at 9 (citing Dkt. No. 24 at 35); and (3) "while Congress may not have intended for Section 9(a)(2) to apply extraterritorially, the plain language of the statute captures domestic manipulation of a commodity from outside of the United States," *id.* at 10. Not only are these standards nowhere contained in *Prime*, but they are also inconsistent with that decision, flatly contradicted by Supreme Court jurisprudence, and premised upon purported "facts" nowhere alleged in the Indictment.

First, the government's "foreseeable and non-incidental connection to the United States" standard finds no support in *Prime* and makes no sense in light of *Prime*'s ruling that what matters for purposes of extraterritoriality is <u>where the alleged manipulation occurred</u>. Here, it is incontrovertible that <u>all</u> the alleged manipulation occurred abroad. *See* Mot. at 13. Moreover, a "foreseeable connection" to the United States standard for extraterritoriality would effectively constitute a reversion to the "effects test," which the Supreme Court rejected in *Morrison*, 561 U.S. at 258-59.

The government's second proposed standard – "intended transmission affecting United States commodities" – fares no better, for the same reasons. Pursuant to *Prime*, extraterritoriality

3

under the CEA turns on where the alleged manipulation occurred, <u>not</u> whether allegedly manipulated rates were ultimately transmitted into the United States or affected a commodity. 937 F.3d at 108. Again, the Supreme Court has rejected just such an "effects test." *Morrison*, 561 U.S. at 258-59. Acceptance of the government's "transmission" argument would constitute a rejection of *Prime*, which also involved the transmission of a benchmark rate into the United States that affected financial transactions on the NYMEX. [3] *See Prime*, 937 F.3d at 100.

The government's third "standard," that the CEA authorizes prosecutions of "domestic manipulation from outside the US," also lacks merit. Preliminarily, it is not at all clear what "<u>domestic</u> manipulation from <u>outside the United States</u>" even means. Surely, however, it <u>cannot</u> mean that rate manipulation taking place outside the United States that has an effect in the United States results in "domestic application" of the CEA, as that is precisely what *Prime* rejected. *Prime*, 937 F.3d at 108. Here, it is incontrovertible that <u>all</u> the alleged manipulative conduct occurred abroad: Société Générale determined its LIBOR submissions in France and submitted them to the BBA in London; only after the BBA separately calculated the LIBOR fix in London was it then transmitted to the United States by Thompson Reuters. *See* Indictment ¶¶ 11, 12, 14—16, 18 & 19.

Despite this sequence of events, the government remarkably contends that this case does not involve a "chain of attenuation across foreign nations" like *Prime*. Resp. at 9, 12, an untenable claim given the allegations in paragraphs 9-19 of the Indictment that are graphically depicted and compared to the allegations in *Prime* at page 13 of Mme. Bescond's motion for reconsideration.

---

[3] The government's argument that "transmission into the United States is especially significant because the CEA proscribes manipulation of a commodity in 'interstate commerce,' and the statute defines interstate commerce to include commerce outside of the United States," Resp. at 10, is plainly wrong. First, this argument contradicts the government's admission that the CEA does not contain a clear statement of extraterritorial application. Resp. at 8. Second, the Supreme Court has explicitly and repeatedly ruled that general references to interstate commerce do not defeat the presumption against extraterritoriality. *See Morrison.*, 561 U.S. at 262–63.

4

Moreover, *Prime* makes abundantly clear that transactions much less removed from the United States than here are impermissibly extraterritorial if the manipulative conduct occurred abroad. 937 F.3d at 107 (citing *Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 201 (2d Cir. 2014)). Although Mme. Bescond explained this in her motion for reconsideration, the government did not provide a response. *See* Mot. at 14-15.

In yet another attempt to obscure the issues, the government asserts that Mme. Bescond's "location in France" cannot immunize her from prosecution in the United States. Resp. at 12. Contrary to the government's argument, Mme. Bescond does not take the position that her location in France immunizes her from prosecution. Rather, pursuant to *Prime*, the issue is <u>where the alleged manipulation occurred</u>, which was in France.[4]

### B.     The Government Fails to Distinguish *Platinum* and *Laydon*

In attempting to distinguish *In re Platinum & Palladium Antitrust Litig.*, 449 F. Supp. 3d 290 (S.D.N.Y. 2020) ("*Platinum II*") and *Laydon v. Mizuho Bank, Ltd.*, No. 12 CIV. 3419 (GBD), 2020 WL 5077186 (S.D.N.Y. Aug. 27, 2020), the government employs its familiar tactic: ignore *Prime*'s standard in favor of one that better suits it.  Thus, the government argues that, in contrast to *Platinum II* and *Laydon*, "the conduct in this case is connected to the United States." Resp. at 13. Not only is this an invented standard, but the overall statement is untrue. Just as *Platinum II* found that the alleged unlawful conduct was "manipulation of the Fix Price that took place during the Fixing Calls in London, not manipulations of particular transactions on NYMEX," *Platinum*

---

[4] *Bascunan v. Elsaca*, 927 F.3d 108, 117 (2d Cir. 2019), cited by the government as authority for the proposition that a defendant's location is not dispositive of whether regulated conduct is domestic, is inapposite. *Bascunan* involved alleged civil RICO violations, and the focus of the civil action provision of that statute is <u>domestic injury</u>.  *RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 354 (2016) ("Section 1964(c) requires a civil RICO plaintiff to allege and prove a domestic injury to business or property. . . ."). Domestic injury is <u>not</u> the focus of the CEA.

*II*, 449 F. Supp. 3d at 331 (internal quotation omitted), here the alleged unlawful misconduct was the manipulation of LIBOR submissions that took place in France, not manipulations of particular transactions on the Chicago Mercantile Exchange. And even if "connection to the United States" were the proper standard, *Platinum II* had *greater* connections because it was alleged that the defendants' "United-States-based traders communicated with the Fixing participants to further the scheme to manipulate the Fix price[.]" *Id.* at 332. Here, the Indictment fails to allege that Bescond or any other bank representative communicated with traders – or anyone – in the United States. Further, *Platinum II* concluded that the allegation related to United States traders "only serves to highlight that the locus of the manipulative scheme was the Fixing itself, which was located in London." *Id.* The same is true here.[5]

*Laydon* is practically identical to this case. There, plaintiffs claimed that "(1) the alleged manipulative Yen LIBOR submissions occurred abroad, which (2) affected the setting of Yen LIBOR determined abroad, which (3) was then disseminated by the BBA in London, which (4) essentially affected Euroyen TIBOR, which, in turn (5) impacted the trading prices of Euroyen TIBOR futures contracts traded on the CME." *Laydon*, 2020 WL 5077186, at *2. *Laydon* easily concluded that, "Defendants' alleged wrongful conduct . . . is almost entirely foreign, rendering it impermissibly extraterritorial." *Id.* (citing *Prime*, 937 F.3d at 107). Each of the steps in *Laydon* is mirrored in this case. The fact that the financial benchmarks were different has no bearing on the location of the manipulative conduct which, in both cases, is predominantly, if not exclusively,

---

[5] In its footnote 2, the government asserts that *Platinum II* only applies to CEA § 22 private-right-of-action claims. Resp. at 13. This is a distinction without significance however, as *Platinum II*'s determination that the plaintiffs had not asserted domestic claims under § 22 was based on the conclusion that the underlying manipulative conduct was predominantly foreign. *See Platinum II*, 449 F. Supp. 3d at 331. This is identical to the applicable standard here.

foreign.[6]

Unable to describe any meaningful distinction between these cases and *Bescond* in terms of the foreign location of the alleged manipulative conduct, the government retreats to the rejected "effects test," arguing, "[m]oreover, as this Court has already determined, 'by alleging an effect on USD LIBOR, the Indictment alleges an <u>effect</u> on the price of commodities bought and sold in the United States. . . .'" Resp. at 13-14 (emphasis added). As *Platinum II* held, however, "although Plaintiffs allege that they have suffered losses in the United States as a result of Defendants' manipulation, it has been clear since *Morrison* that an allegation that a foreign course of conduct has caused malign effects in the United States is not enough to salvage an otherwise extraterritorial claim." 449 F. Supp.3d at 331 (citing *Morrison*, 561 U.S. at 259 and *Prime*, 937 F.3d at 106-07).

## II. This Prosecution Also Violates Due Process

According to the government, Mme. Bescond's due process argument is premised upon her contention that this prosecution is impermissibly extraterritorial. Resp. at 14. Contrary to the government's suggestion, it has <u>never</u> been Mme. Bescond's position that the due process nexus requirement in *United States v. Al Kassar*, 660 F.3d 108, 118 (2d Cir. 2011) is only applicable in cases involving an extraterritorial application of the law. Rather, Mme. Bescond contends that the due process nexus test is an independent standard the government must meet, separate from the extraterritoriality analysis, in order to properly charge foreign actors for conduct occurring abroad. The two inquiries address separate concerns: the extraterritoriality inquiry addresses the

---

[6] The "transmission" of information by Thomson Reuters, which the government relies upon, is no different than in *Platinum II* or *Laydon,* where the manipulated rates were similarly widely disseminated. *Platinum II*, 449 F. Supp. 3d at 331 (rejecting argument that manipulation of a benchmark rate abroad, which rate is then transmitted to and applied in the United States, involves a domestic application of the CEA); *Laydon*, 2020 WL 5077186, at *2 (dissemination of LIBOR fix affected by manipulated bank submissions into the United States does not constitute a domestic application of the CEA).

geographical reach of a statute, *see Morrison*, 561 U.S. at 253-54, while the nexus analysis examines whether the exercise of jurisdiction over a particular defendant is fair, *see Al Kassar*, 660 F.3d at 118. The government's unfounded argument would dramatically dilute constitutional due process rights in criminal cases where a statute is being applied domestically. As a result of its fallacious reasoning, the government does not even address the nexus test: whether Mme. Bescond aimed to cause harm inside the United States or to its citizens or interests. *Id.* Even were the government correct that *Al Kassar's* due process requirements only apply in cases involving an extraterritorial prosecution, this is such a prosecution, as set out in detail above.

III.   **If the Court Declines to Dismiss the Indictment Under *Prime*, the Court Should Grant Mme. Bescond's Statute of Limitations and Selective Prosecution Motions, or at a Minimum, Order the Government to Provide Discovery and Additional Briefing**

Although *Prime* squarely compels dismissal of the Indictment, if the Court rules otherwise, it will then, pursuant to the Second Circuit's remand order, need to consider Mme. Bescond's statute of limitations and selective prosecution motions. *Bescond*, 24 F.4th at 764 & 775. The Court already determined in its May 2019 Decision that "even if the Court were inclined to rule on her motions, it would <u>require</u> additional briefing and information on her selective prosecution and statute of limitations arguments."[7] *Sindzingre*, 2019 WL 2290494, at *9 (emphasis added). Thus, there is no need for a status conference on this issue as the government requests. Resp. at 14-18.

To date, the government has conspicuously failed to satisfy its burden of establishing that the statute of limitations was met, limiting its "evidence" to the production of tolling orders from the Districts of Connecticut and the Southern District of New York and an unsworn statement

---

[7] The government recognizes in its response that the reason the Court did not order discovery and additional briefing on Mme. Bescond's statute of limitations and selective prosecution motions was its (now reversed) application of the Fugitive Disentitlement Doctrine. Resp. at 5 n.1.

8

about when "the French authorities formally ended their assistance related to these requests [for foreign evidence]." Resp. at 17.[8]  However, as explained in detail by Mme. Bescond in briefing on this issue, *see* Dkt. No. 23, simply obtaining tolling orders does <u>not</u> close the inquiry under § 3292. Section 3292 provides that the period of suspension "begins on the date on which the official request is made and ends on the date on which the foreign court or authority takes final action on the request." 18 U.S.C. § 3292(b). The statute further provides that a period of suspension "shall not exceed three years," and if final action occurs before the statute of limitations would otherwise expire, the period of suspension is limited to six months.  *Id.* at subsec. (c).  The government has not produced any <u>evidence</u> of when it made requests for foreign assistance or when "final action" was taken with respect to each request.  This prevents the Court from calculating any proper tolling period.[9]  Moreover, the government <u>never obtained a tolling order from a judge in the Eastern District of New York</u>.  This deprives the government of the benefit of any tolling under § 3292, which states that tolling orders are to be obtained from "<u>the district court before which a grand jury is impaneled to investigate the offense</u>." *Id* at § 3292(a)(1). (emphasis added).[10]

Now that the Second Circuit has ruled that Mme. Bescond is not subject to the Fugitive Disentitlement Doctrine, the Court could easily grant the motion to dismiss the Indictment as time barred.  To the extent that additional information and briefing is needed, the government should

---

[8] The government concedes, as it must, that the Indictment is untimely on its face. Dkt. No. 10 at 16.

[9] Indeed, the Court's May 2019 Decision recognized that the government had not met its burden of demonstrating compliance with the statute of limitations, stating that additional information and briefing would be necessary to decide this issue, despite the government having produced the tolling orders. *Sindzingre*, 2019 WL 2290494, at *9.

[10] The government also argues that Mme. Bescond cannot obtain discovery without appearing but cites no authority that actually stands for that proposition other than Fed. R. Crim. P. 16.1, which simply indicates that the attorneys in a criminal case must meet and confer regarding discovery within 14 days after arraignment.  Defense counsel satisfied any meet-and-confer requirement by asking the government to produce relevant discovery before filing the motion for reconsideration.

be ordered to demonstrate why the statute of limitations did not run prior to the Indictment and produce all the documents requested in Mme. Bescond's motion for reconsideration which would prove or disprove this contention.

The government similarly refuses to provide any substantive response on selective prosecution, contending that Mme. Bescond has made no "showing of proof beyond conclusory allegations." Resp. at 15-16. To the contrary, Mme. Bescond has provided significant credible evidence establishing a prima facie case of differing treatment of similarly situated persons,[11] by way of the government's own statements in, *inter alia*, its Deferred Prosecution Agreement with Société Générale ("SocGen") (Dkt. No. 12, Ex. A) and its related CFTC Order (Dkt. No. 12, Ex. B) demonstrating that the government amassed significant evidence that unindicted male executives directed the manipulation scheme at issue. *See* Dkt. No 12, Ex. A at A-42 ¶ 19 (SocGen Male Executive-1 instructed Ms. Sindzingre to lower SocGen's LIBOR submissions), A-46—A-47 ¶ 30 (quoting email summarizing discussion with SocGen Male Executive-2 regarding manipulation of LIBOR submissions), A-54 ¶ 59 (describing telephone conversation between Ms. Sindzingre and SocGen Male Executive-2 referencing executive direction to manipulate the LIBOR submissions); Dkt. No. 12, Ex. B at 13, 16-17 (setting out exchanges between Ms. Sindzingre and SocGen Male Executives in which she was directed by them to ensure that LIBOR submissions did not harm the bank's reputation); Dkt. No. 12-4 at 5 (MLAT request directed to French government stating that evidence indicated that the CEO and CFO – both male – of SocGen's Corporate Investment Bank directed the manipulation scheme); Dkt. No. 12-5 (DOJ press release stating: "The USD LIBOR manipulation scheme was ordered by senior executives

---

[11] The government admits this is the applicable standard. Resp. at 16.

[all male] of Société Générale, who tasked the managers of the company's Treasury Department [Sindzingre and Bescond] with overseeing the execution of the deflation effort.") (emphasis added). Indeed, Bescond's brief in support of her original selective prosecution motion included a chart illustrating the clear gender disparity, depicting the positions and genders of all 28 individuals identified as being involved in the manipulation scheme and highlighting that all 25 males on this chart avoided prosecution – including several senior executives who ordered the manipulation – while only one low-level female went unindicted.  Dkt. No. 12 at 11.  Rather than address this substantial evidence of disparate treatment and thereby meet its clear burden to disprove selective prosecution, the government ignores it entirely.

Instead, the government feebly states it is "simply not true" that Bescond was similarly situated to uncharged male executives and that she ignores legitimate distinguishing factors relevant to charging decisions.  Resp. at 17.  However, the government nowhere explains <u>why</u> Mme. Bescond is not similarly situated to uncharged male senior executives who, according to the government's own statements, directed the scheme at issue, or why these more senior males' roles in directing the scheme might be a legitimate basis for non-prosecution.  Nor does the government explain why the significant evidence amassed against these male executives would justify declining to prosecute them.

In an attempt to shift the focus, the government contends that men have been prosecuted in similar schemes in the Southern District of New York.  Resp. at 16-17.  That the U.S. Attorney's Office for the <u>Southern</u> District of New York has indicted men in <u>other</u> LIBOR manipulation cases does nothing to refute Mme. Bescond's argument that the U.S. Attorney's Office for the <u>Eastern</u> District of New York, engaged in selective prosecution based upon gender in <u>this</u> case.  Indeed,

11

the cases cited by the government were not only brought by a different prosecutor's office but involved defendants who are <u>not similarly situated</u> to Mme. Bescond because those cases involved alleged LIBOR manipulation for the purpose of profiting from trading positions, not to protect the relevant banks' reputations, as is the case here.

For all of these reasons, the Court is in a position to grant Mme. Bescond's motion to dismiss based on selective prosecution, due to the government's failure to meet its burden.   At a minimum, Mme. Bescond has met the threshold for obtaining discovery, and the government should be required to provide the information requested by Mme. Bescond in anticipation of further briefing.[12]

## CONCLUSION

For the foregoing reasons, the Mme. Bescond's motion for reconsideration should be granted and the Indictment dismissed.


Respectfully submitted,

BLANK ROME LLP                                    LAURENT COHEN-TANUGI AVOCATS

By:   *s/ Laurence S. Shtasel*                        *s/ Laurent Cohen-Tanugi*
        Laurence S. Shtasel                               Laurent Cohen-Tanugi
        Reg. # 2333110                                    Reg. # 1971555
        Bridget M. Briggs (*pro hac vice*)        20, Boulevard des Invalides
        One Logan Square                              75007 Paris, France
        Philadelphia, PA  19103                      Tel: +33 (0) 1 47 05 38 00
        Tel: (215) 569-5691

   Dated:  July 14, 2022                              *Attorneys for Muriel Bescond*

---

[12] To the extent the government claims that any particular items are protected from disclosure, it should identify those items and the bases for such protection while producing the remaining documents.

12

## CERTIFICATE OF SERVICE

I, LAURENCE S. SHTASEL, hereby certify that on this 14th day of July 2022, I caused a true and correct copy of the foregoing Reply in Support of Motion for Reconsideration to be served upon all counsel of record by ECF filing.

s/ Laurence S. Shtasel
LAURENCE S. SHTASEL